RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0299p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

COMMUNITIES FOR EQUITY,

　　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

MICHIGAN HIGH SCHOOL ATHLETIC ASSOCIATION,

　　　　　　　　　*Defendant-Appellant.*

> No. 02-1127

On Remand from the United States Supreme Court.
No. 98-00479—Richard A. Enslen, District Judge.

Argued: March 14, 2006

Decided and Filed: August 16, 2006

Before: KENNEDY, COLE, and GILMAN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Maureen E. Mahoney, LATHAM & WATKINS, Washington, D.C., for Appellant. Kristen Galles, EQUITY LEGAL, Alexandria, Virginia, for Appellee. **ON BRIEF:** Maureen E. Mahoney, LATHAM & WATKINS, Washington, D.C., for Appellant. Kristen Galles, EQUITY LEGAL, Alexandria, Virginia, for Appellee. Brad A. Banasik, MICHIGAN ASSOCIATION OF SCHOOL BOARDS, Lansing, Michigan, Jonathan E. Lauderbach, CURRIE KENDALL, Midland, Michigan, for Amici Curiae.

　　　　GILMAN, J., delivered the opinion of the court, in which COLE, J., joined. KENNEDY, J. (pp. 20-24), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

　　　　RONALD LEE GILMAN, Circuit Judge. Communities for Equity (CFE), a group comprised of parents and high school athletes that advocates on behalf of Title IX compliance and gender equity in athletics, brought a class action lawsuit against the Michigan High School Athletic Association (MHSAA), arguing that MHSAA's scheduling of sports seasons discriminates against female athletes on the basis of gender. The district court concluded that MHSAA's actions violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title IX of the Civil Rights Act of 1964, and Michigan's Elliott-Larsen Civil Rights Act. In 2004, this court affirmed the judgment of the district court on the ground that MHSAA's actions violate the Equal Protection Clause. *Cmtys. for Equity v. Mich. High School Athletic Ass'n (CFE I)*, 377 F.3d 504 (6th Cir. 2004). The *CFE I* court did not reach the Title IX or state-law issues.

Following a petition for certiorari filed by MHSAA, the United States Supreme Court vacated the *CFE I* decision and remanded the case for further consideration. The order, commonly referred to as a grant/vacate/remand order (GVR), directed this court to reconsider the case in light of *Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005), a case decided in the Court's last term. After reconsideration, and for the reasons set forth below, we again **AFFIRM** the judgment of the district court.

## I. BACKGROUND

The background of this case is thoroughly discussed in the findings of fact of the district court, *Communities for Equity v. Michigan High School Athletic Association*, 178 F. Supp. 2d 805, 807-846 (W.D. Mich. 2001), and in *CFE I*, 377 F.3d at 506-10. CFE's basic complaint is that MHSAA discriminates against female high-school athletes by scheduling girls' sports to play in disadvantageous, nontraditional seasons. Our task is now to reevaluate this claim in light of the Supreme Court's GVR, which provides in relevant part as follows: "Petition for writ of certiorari granted. Judgment vacated, and case remanded to the United States Court of Appeals for the Sixth Circuit for further consideration in light of our opinion in *Rancho Palos Verdes v. Abrams*. . . ." *Mich. High School Athletic Ass'n v. Cmtys. for Equity*, 125 S. Ct. 1973 (2005).

On remand, MHSAA argues that, based on the Supreme Court's decision in *Ranchos Palos Verdes*, Title IX provides the exclusive remedy for the alleged violations that bars CFE from seeking additional remedies under 42 U.S.C. § 1983. CFE responds by contending that *Rancho Palos Verdes* does not apply to the present case and that CFE is therefore entitled to prevail under both Title IX *and* § 1983.

## II. ANALYSIS

### A.    Standard of review

Constitutional and statutory interpretation questions are issues of law, which we review de novo. *Ammex, Inc. v. United States*, 367 F.3d 530, 533 (6th Cir. 2004). In contrast, we apply the "clearly erroneous" standard of review to the factual findings of the district court. *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 519 (6th Cir. 2003).

### B.    The Effect of *Rancho Palos Verdes*

#### 1.    *Implications of the GVR*

MHSAA relies on the following description of the GVR procedure to argue that the result in *CFE I* must be altered:

> Where intervening developments, or recent developments that we have reason to believe the court below did not fully consider, reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome of the litigation, a GVR order is . . . potentially appropriate.

*Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (holding that a GVR is "an appropriate exercise of [the Supreme Court's] discretionary certiorari jurisdiction"). Subsequent interpretations of that language, however, make clear that a GVR does not indicate, nor even suggest, that the lower court's decision was erroneous.

In *Stutson v. United States*, 516 U.S. 193, 197-98 (1996), for example, the Court issued a GVR directing the Eleventh Circuit to reconsider that case in light of the Supreme Court's decision in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380 (1993). Focusing on the fact that the Eleventh Circuit did not fully consider whether *Pioneer* applied, and classifying *Pioneer* as a "*potentially* relevant decision[]," 516 U.S. at 197 (emphasis added), the *Stutson* Court acknowledged that the Eleventh Circuit may "conclude that *Pioneer* does not apply" and thus reach the same result on remand. *Id.* at 196.

Other courts have also opined that a GVR does not necessarily indicate that the Supreme Court desires a different result. In *Gonzales v. Justices of the Municipal Court of Boston*, 420 F.3d 5, 7 (1st Cir. 2005), for example, the First Circuit pondered the implication of a GVR that instructed the court to reconsider an earlier holding in light of a recent Supreme Court decision. After discussing the above-quoted language from *Lawrence*, the *Gonzales* court opined:

> It is important to remember, however, that a GVR order is neither an outright reversal nor an invitation to reverse; it is merely a device that allows a lower court that had rendered its decision without the benefit of an intervening clarification to have an opportunity to reconsider that decision and, if warranted, to revise or correct it. . . . Consequently, we do not treat the Court's GVR order as a thinly-veiled direction to alter our course; rather, the order recognizes—as do we—that the *Smith* decision is pertinent and requires us to determine whether anything that the *Smith* Court said demands a different result.

*Id.* at 7-8; *see also United States v. Norman*, 427 F.3d 537, 538 n.1 (8th Cir. 2005) ("The GVR is not the equivalent of a reversal on the merits, however. Rather, the Court remands for the sake of judicial economy—so that the lower court can more fully consider the issue with the wisdom of the intervening development."). The GVR therefore requires us to consider the effect of *Rancho Palos Verdes* on the present case, but it does not suggest that the Supreme Court believes that *CFE I* was wrongly decided.

### 2.       *Summary of the* Sea Clammers/Rancho Palos Verdes *doctrine*

In order to analyze the issue highlighted by the GVR, a brief summary of § 1983 and the line of cases on which *Rancho Palos Verdes* relied is essential. The key language of 42 U.S.C. § 1983 provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

For plaintiffs, then, § 1983 serves as a vehicle to obtain damages for violations of both the Constitution and of federal statutes.

*Middlesex County Sewerage Authority v. National Sea Clammers*, 453 U.S. 1 (1981), is the seminal case discussing the intersection between statutory remedies and § 1983, and it provides the basis for the Supreme Court's later decision in *Rancho Palos Verdes*. In *Sea Clammers*, the plaintiffs were fishermen who worked off the coast of New York and New Jersey. They brought suit under the Federal Water Pollution Control Act (the FWPCA), 33 U.S.C. § 1251, the Marine Protection, Research, and Sanctuaries Act of 1972 (the MPRSA), 33 U.S.C. § 1401, and § 1983,

alleging a violation of the preceding statutes as a result of damage to fishing grounds caused by polluters dumping sewage and other waste in the ocean.  *Sea Clammers*, 453 U.S. at 4-5.

The substantive statutes at issue in *Sea Clammers*—the FWPCA and the MPRSA—authorize the Administrator of the Environmental Protection Agency (EPA) to seek civil and criminal penalties for violations of the acts, and permitted "any interested person[]" to seek judicial review of the Administrator's actions regarding the issuance of pollutant discharge permits and the establishment of pollution standards.  *Id*. at 13-14.   Both statutes contain an express citizen-suit provision, but those provisions authorize private parties to sue only for injunctive relief rather than the monetary relief the plaintiffs in *Sea Clammers* were seeking.  *Id*.

The *Sea Clammers* Court focused on Congress's intent, and held that the plaintiffs could not use § 1983 as a vehicle to enforce federal statutory laws where the acts themselves contained "unusually elaborate enforcement provisions."  *Id*. at 13.  Because Congress enacted "so many specific statutory remedies, including the two citizen-suit provisions" in the FWPCA and the MPRSA, the Court found it "hard to believe that Congress intended to preserve the § 1983 right of action."  *Id*. at 20.  Instead, the *Sea Clammers* Court emphasized that the nature and extent of the remedies available in the water-pollution statutes clearly indicated that Congress had considered the methods of redress for violations of the statutes and intended the remedies provided in the statutes to be complete.  *Id*.  As a result, the Court held that when claiming a violation of the FWPCA and the MPRSA, the remedies authorized in those acts preclude resort to § 1983.

The Court interpreted the *Sea Clammers* doctrine a few years later in *Smith v. Robinson*, 468 U.S. 992 (1984).  In *Smith*, the plaintiffs were the parents of  a handicapped child who was allegedly being denied a "free appropriate public education."  They brought suit against the school district for relief under the Education of the Handicapped Act (the EHA), 20 U.S.C. § 1400, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment, pursuant to § 1983.  Unlike *Sea Clammers*, which concerned an effort to enlarge a statutory remedy by asserting a claim based on the "and laws" provision of § 1983, the *Smith* case questioned the ability of plaintiffs to use § 1983 as a vehicle to enforce a constitutional remedy *in addition to* the remedies available under the EHA.  *Id*. at 1005.   Because the Court concluded that the constitutional claims were "virtually identical to their EHA claims," it framed the issue as whether "Congress intended the EHA to be the exclusive avenue through which a plaintiff may assert those claims."  *Id*. at 1009.

The Court then engaged in a thorough analysis of the EHA's provisions and legislative history in order to answer this question.  *Id*. at 1009-12.  After discussing the "carefully tailored administrative and judicial mechanism set out in the [EHA]," the Court concluded:

> In light of the comprehensive nature of the procedures and guarantees set out in the EHA and Congress' express efforts to place on local and state education agencies the primary responsibility for developing a plan to accommodate the needs of each individual handicapped child, we find it difficult to believe that Congress also meant to leave undisturbed the ability of a handicapped child to go directly to court with an equal protection claim to a free appropriate public education. . . . [W]e think Congress' intent is clear.  Allowing a plaintiff to circumvent the EHA administrative remedies would be inconsistent with Congress' carefully tailored scheme.

*Id*. at 1011-12.  In other words, Congress intended for the EHA to serve as the exclusive method by which plaintiffs could assert the right to a free appropriate public education, and resort to § 1983 is prohibited.  *Id.* at 1013. Such an intent, according to the Court, was found in the comprehensive procedures and guarantees established in the EHA.  *Id*.

Finally, the Court decided *Rancho Palos Verdes* in 2005 and remanded the present case in light of that decision. In *Rancho Palos Verdes*, plaintiff Abrams brought suit against the Rancho Palos Verdes municipal government after he was denied a permit to build a radio tower on his property. 125 S. Ct. at 1457. Abrams sought injunctive relief under the Telecommunications Act (the TCA), 47 U.S.C. § 327(c)(7), and damages and attorney's fees under § 1983—essentially using both statutes to enforce the violation of rights created by the TCA. *Id.* Like the statutes at issue in *Sea Clammers* and *Smith*, the TCA itself does not expressly provide for monetary relief. *Id.* at 1459. Instead, the TCA permits private parties to seek redress through administrative channels and through injunctive relief in the courts. *Id.*; *see also* 47 U.S.C. § 332(c)(7). The Court, as it had done in *Sea Clammers*, 435 U.S. at 20, framed the issue as whether Congress intended the judicial remedy expressly authorized in the TCA to coexist with the alternative remedy authorized in § 1983. *Rancho Palos Verdes,* 125 S. Ct.. at 1458.

Although the TCA expressly provides a private judicial remedy, the Court explicitly rejected the notion that the availability of a private remedy under the substantive statute necessarily forecloses an action under § 1983. *Id.* at 1459; *see also ASW v. Oregon*, 424 F.3d 970, 977-78 (9th Cir. 2005) (characterizing the holding of *Rancho Palos Verdes* as one focused on the comprehensiveness of the remedy). The Court instead looked to the extent of the remedy authorized by the TCA, reasoning that "the existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not." *Rancho Palos Verdes,* 125 S. Ct. at 1458-59 (noting that both *Sea Clammers* and *Smith* "rested upon the existence of more restrictive remedies provided in the violated statute itself"). After engaging in a careful analysis of the legislative history of the TCA and the remedies it expressly provided, *id.* at 1459-62, the Court concluded that Congress must have intended the TCA remedies to be the exclusive relief available to a plaintiff complaining of a TCA violation. *Id.* at 1462.

*Sea Clammers* and the other cases on which the Supreme Court relied operate under the assumption that limitations placed by Congress upon statutory remedies are not to be evaded through § 1983. *See ASW*, 424 F.3d at 978 (noting that the *Rancho Palos Verdes* Court wanted to prevent § 1983 from serving as an "end run around the enforcement mechanism Congress provided"). The TCA, like the statutes at issue in *Sea Clammers* and *Smith*, contains express private remedies for violations of rights granted in those statutes. *See Rancho Palos Verdes*, 125 S. Ct. at 1458-59, 1462. Because the administrative and judicial remedies authorized in the TCA are detailed, yet more restrictive than the remedies available under § 1983, the Court reasoned that it would contravene Congress's intent to allow Abrams to recover under both statutes where Congress had provided in the TCA precisely the remedies it considered appropriate. *Id.* at 1462.

### 3.      *Application of the* **Sea Clammers/Rancho Palos Verdes** *doctrine to Title IX*

As a result of the decision in *Rancho Palos Verdes* and the GVR, MHSAA argues that Title IX precludes CFE's claims under § 1983. CFE, however, contends that the *Sea Clammers* line of cases does not control the result here, and urges us to reach the merits of both the Title IX claim *and* the constitutional claims brought pursuant to § 1983. For the reasons set forth below, we agree with CFE that Title IX does not preclude recovery under § 1983.

Both *Sea Clammers* and *Rancho Palos Verdes* dealt with plaintiffs who attempted to enforce federal statutory rights through the "and laws" language of § 1983. The *Sea Clammers* plaintiffs based their action on several federal statutes, but sought recovery pursuant to § 1983 because of the additional remedies available through that statute that were not available under the substantive water- pollution statutes. Similarly, the plaintiff in *Rancho Palos Verdes* sought money damages and attorney's fees pursuant to § 1983 because the TCA failed to authorize that type of recovery.

In both *Sea Clammers* and in *Rancho Palos Verdes*, furthermore, the rights that plaintiffs were asserting were based solely on federal statutory law—in other words, rights created by Congress. Even though the statutes that created the very rights that they were asserting did not authorize monetary damages, the plaintiffs in *Sea Clammers* and *Rancho Palos Verdes* sought such damages pursuant to § 1983.

This litigation strategy was explicitly disapproved of by the Supreme Court in both cases and forms the bedrock for the *Sea Clammers* principle. The key inquiry is whether Congress intended the remedies in the substantive statute to be exclusive. *See Sea Clammers,* 453 U.S. at 14 ("In view of these elaborate enforcement provisions, it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under [the water-pollution statutes].)" To allow the plaintiffs in such cases to benefit from the additional remedies available pursuant to § 1983 would create an end-run around the substantive statutory remedies and contravene Congress's intent. *See, e.g.*, *Smith,* 468 U.S. at 1012 (relying on the *Sea Clammers* doctrine to hold that "[a]llowing a plaintiff to circumvent the EHA administrative remedies would be inconsistent with Congress' carefully tailored scheme"). The Court recently reaffirmed its concern in *Rancho Palos Verdes* when it held that "enforcement [of the TCA] through § 1983 would distort the scheme of . . . limited remedies created by [the TCA]." 125 S. Ct. at 1462.

Unlike the plaintiffs in *Sea Clammers* and *Rancho Palos Verdes*, CFE invoked § 1983 not as a vehicle to enforce the substantive federal law found in Title IX, but as a vehicle to recover for alleged violations of the Equal Protection Clause of the Fourteenth Amendment. This is a critical distinction. The Court's analysis both in *Sea Clammers* and *Rancho Palos Verdes* hinges on the fact that when Congress created the particular rights through statute, it also created particular remedies for those statutory violations. See *Rancho Palos Verdes*, 125 S. Ct. at 1458 ("Thus, the existence of a more restrictive private remedy has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not."); *see also Sea Clammers,* 453 U.S. at 20 ("When the remedial devices provided in a particular act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983.").

In the present case, however, CFE asserts violations of Title IX *and* of the Fourteenth Amendment, meaning that CFE's allegations would be actionable even if Congress had never enacted Title IX. The question of what Congress intended, then, concerns not only which remedies Congress sought to provide for Title IX violations, but whether Congress intended to abandon the rights and remedies set forth in Fourteenth Amendment equal protection jurisprudence when it enacted Title IX in 1972.

Because *Sea Clammers* and *Rancho Palos Verdes* concerned plaintiffs who attempted to recover only for violations of federal statutory law (as opposed to constitutional law) through the enforcement mechanism of § 1983, those cases are distinguishable from the present case. Although not on all fours, the *Smith* case provides the closest fit to the situation here because the § 1983 claims in *Smith* were based on Fourteenth Amendment violations rather than the violations of "other laws." 468 U.S. at 1005. The *Smith* Court held that where the constitutional claims pursuant to § 1983 were "virtually identical" to the statutory claims, the § 1983 claims were precluded because "Congress intended handicapped children with constitutional claims to a free appropriate public education to pursue those claims through the carefully tailored administrative and judicial mechanism set out in the statute." *Id*. at 1009.

Applying *Smith* to the case before us, the necessary factors to consider in order to determine if Title IX precludes resort to § 1983 are (1) whether CFE's Title IX claims are "virtually identical" to its constitutional claims, and (2) whether the remedies provided in Title IX indicate that Congress

intended to preclude reliance on § 1983. *Id.* Recovery under § 1983 is precluded by *Smith* only if both factors are satisfied. *See Smith*, 468 U.S. at 1009.

A comprehensive discussion of both factors is not necessary so long as one factor is clearly not satisfied, which is the case here. *See Lillard v. Shelby County Board of Education*, 76 F.3d 716, 723 (6th Cir. 1996) (declining to engage in a protracted discussion of the first factor because the second one was not satisfied). So even if we were to hold that CFE's Title IX claims are "virtually identical" to its claims brought pursuant to § 1983, we would still have to consider whether Congress intended for Title IX to supplant CFE's constitutional claim pursuant to § 1983. *See Smith*, 468 U.S. at 1009 (determining that the claims were virtually identical and then considering "whether Congress intended that the EHA be the exclusive avenue through which a plaintiff may assert those claims.").

Our dissenting colleague correctly notes that the *Smith* inquiry contains two prongs: (1) whether the constitutional claim pursuant to § 1983 is virtually identical to the claim under Title IX, and (2) whether Title IX provides a remedy comprehensive enough to be exclusive. After articulating the inquiry, however, the dissent appears to conflate the two prongs by stating that once a court determines that the constitutional claim pursuant to § 1983 is virtually identical to the statutory claim, we have reason to "assume that Congress intended to preclude use of § 1983 to enforce those claims." Dissenting Op. at 23. This purported presumption finds no support in the caselaw, and we respectfully disagree that such a presumption exists. We instead believe that the two prongs set forth in *Smith* are intended to be independently evaluated. Neither the Supreme Court nor any of our sister circuits has suggested that the second prong is a more difficult obstacle for a plaintiff to overcome once the first prong is satisfied.

This court in *Lillard* has already addressed the second prong of the *Smith* inquiry—whether Title IX provides a remedy comprehensive enough to be exclusive. *Id.* Several plaintiffs in *Lillard* sought relief under both Title IX and under the First and Fourteenth Amendments (as remedied through § 1983). The *Lillard* court was faced with the issue of "whether Title IX's statutory remedy precludes the plaintiffs from bringing a substantive due process claim under section 1983," *id.* at 718, and it began its analysis by distinguishing *Sea Clammers*:

> [W]hile in *National Sea Clammers*, allowing the section 1983 action to enforce the rights at issue would have effectively circumvented the implicit congressional intention to foreclose the private rights of action, here, the plaintiffs' section 1983 action does not attempt either to circumvent Title IX procedures, or to gain remedies not available under Title IX. . . . Plainly, *National Sea Clammers* does not, on its face, stand for the proposition that a federal statutory scheme can preempt independently existing constitutional rights, which have contours distinct from the statutory claim, thus prohibiting a section 1983 action grounded in substantive due process. Instead, that case speaks only to whether federal statutory rights can be enforced both through the statute itself *and* through section 1983.

*Id.* at 723.

After distinguishing *Sea Clammers*, the *Lillard* court went on to characterize *Smith* as standing for the proposition that Congress can create a statutory vehicle as an alternative to enforcing constitutional rights pursuant to § 1983. *Id.* As highlighted by the second factor of the *Smith* inquiry, however, Congress's intent to do so must be clear. *Id.*

The *Lillard* court concluded that, in contrast to the statutes at issue in *Sea Clammers* and *Smith*, Title IX contains no comprehensive enforcement scheme indicating that Congress intended

to preclude recovery under § 1983. *Id.* Although the Supreme Court found an implied private right of action for Title IX violations in *Cannon v. University of Chicago*, 441 U.S. 677, 683 (1979), the only enforcement mechanism expressly authorized in Title IX is the withdrawal of federal funds. *Lillard*, 76 F.3d at 723. This stands in stark contrast to the water-pollution statutes at issue in *Sea Clammers* and the EHA at issue in *Smith*. Those statutes expressly provided "carefully tailored" administrative and judicial remedies clearly indicating that Congress intended plaintiffs seeking redress to use the substantive statute rather than the additional remedies available under § 1983. *Sea Clammers*, 453 U.S. at 20; *Smith*, 468 U.S. at 1009. A review of the provisions and legislative history of Title IX, however, led this court to the following conclusion:

> One can only conclude, therefore, that *National Sea Clammers* does not speak to Title IX, since there is no evidence in Title IX that 'Congress intended to foreclose [a § 1983] action by providing an exclusive remedy within' Title IX. Thus, even if the defendants' argument had been directed at an attempt by the plaintiffs to enforce their Title IX rights, rather than their constitutional rights, through section 1983, *National Sea Clammers* would have provided no support.

*Lillard*, 76 F.3d at 723 (citation omitted).

Whereas the Supreme Court in *Sea Clammers* and *Smith* was able to highlight specific statutory remedies as evidence of Congress's intent for the substantive statutes to provide the exclusive means of relief, the *Lillard* court found no similar examples of congressional intent in Title IX. Title IX, after all, contains *no* express private remedy at all. *Id.; see also Rancho Palos Verdes*, 125 S. Ct. at 1459 (citing *Sea Clammers* and *Smith*, and explaining that the existence of a private judicial remedy is an important factor to consider when attempting to discern congressional intent). *Lillard*, then, concluded that the remedies afforded in Title IX are insufficient to preclude the pursuit of a remedy under § 1983.

### 4.     *The precedential value and vitality of* Lillard

Our dissenting colleague argues that we are not bound by *Lillard* because its discussion regarding the extent of the Title IX remedy was dicta. *See* Dissenting Op. at 23. We respectfully disagree. Rather than focusing on the first *Smith* factor—whether the constitutional and statutory claims are virtually identical—the *Lillard* court held that *"neither [Smith] factor appears here."* 76 F.3d 716, 723 (6th Cir. 1996) (emphasis added). We therefore do not see the holding as one focused on the first *Smith* factor, nor the discussion of the second *Smith* factor as dicta. In fact, the *Lillard* court engaged in no substantive analysis of the first *Smith* factor at all, instead dedicating the entirety of the *Smith* analysis to a discussion of the second factor—whether Title IX provides a remedy comprehensive enough to be exclusive.

The dissent's emphasis on one line of *Lillard* to the effect that *Sea Clammers* would not have required preemption "even if the defendants' argument had been directed at an attempt by the plaintiffs to enforce their Title IX rights," Dissenting Op. at 23, does not persuade us that *Lillard*'s conclusion as to the extent of the Title IX remedy was dicta. In *Lillard*, the court articulated two "important distinctions" that rendered the *Sea Clammers* analysis inapposite: (1) the plaintiffs in *Lillard* were seeking to enforce constitutional rights rather than statutory rights, and (2) Title IX, unlike the statutes at issue in *Sea Clammers*, did not provide a comprehensive and exclusive remedy. 76 F.3d at 722-23. The "even if" language on which our colleague seizes, then, proves nothing more than that the court had two grounds for concluding that the plaintiffs could seek remedies under both Title IX and § 1983, and that the outcome would have remained the same despite the nature of the underlying claim.

We also acknowledge our dissenting colleague's argument that *Lillard* should not control our decision in the present case because *Lillard* dealt with a substantive due process claim pursuant to § 1983 rather than an equal protection claim. *See* Dissenting Op. at 21-25. Contrary to our dissenting colleague's view, however, we see no consequence to this distinction. As discussed above, regardless of whether CFE's equal protection claim is "virtually identical" to its Title IX claim, we still must consider whether Title IX provides the exclusive and comprehensive remedy for MHSAA's alleged violations. *Lillard* answered this latter inquiry in the negative, and we remain bound by its holding despite the dissent's suggestion that "[w]hen ascertaining Congress' intent, . . . we have to do so with the precise rights in mind." Dissenting Op. at 22.

Although the *Lillard* court noted that the plaintiffs were seeking to enforce substantive due process rights that were "wholly independent" and "totally distinct" from the rights granted in Title IX, its discussion of the extent of the remedies contained in Title IX focused on the provisions of Title IX generally, not on whether Title IX's enforcement scheme was comprehensive with regard to the substantive due process claim. We have found no decision, either by the Supreme Court or our sister circuits, holding that Congress intended Title IX to be the exclusive remedy for one claim but not another, and we fail to understand how this could possibly be the case considering that Congress provided no express remedies at all in the statute.

The dissent also relies on *Smith*, 468 U.S. at 1013-1014, as support for the proposition that "for each constitutional claim, a court must engage in a separate analysis of whether that claim, provided for by a statutory remedy, is precluded from being brought under § 1983. . . ." Dissenting Op. at 22. Although we acknowledge that the *Smith* Court did in fact contemplate two separate analyses—one concerning the equal protection claim and one concerning the substantive due process claim—the statute at issue in *Smith* provided *express* remedies that the Court concluded were carefully tailored so as to preempt recovery for an equal protection violation under § 1983. The *Smith* Court's apparent willingness (we say willingness because the Court did not ultimately reach this issue) to conduct a similar analysis as it pertained to substantive due process is not surprising given the clear textual indication of Congress's intent in the EHA to preempt reliance on § 1983 by affording a comprehensive remedy for equal protection claims, whereas the statutory language may not provide an adequate remedy for other constitutional claims brought pursuant to § 1983.

*Lillard*'s analysis, however, was based on the fact that "Title IX contains no comprehensive enforcement scheme." 76 F.3d at 723. The *Lillard* court did not suggest that the dearth of enforcement provisions in Title IX was relevant to substantive due process claims only, as opposed to equal protection claims or other claims brought pursuant to § 1983. In fact, language in the opinion indicates that the court considered the lack of remedies in Title IX as it pertained to *all* § 1983 claims. *Id.* ("[T]here is no evidence in Title IX that Congress intended to foreclose a section 1983 action by providing an exclusive remedy within Title IX.") (citation and quotation marks omitted).

Two of our sister circuits, moreover, have relied on *Lillard* to hold that Title IX is not comprehensive enough to be exclusive even though the plaintiffs in those cases sought relief under § 1983 for equal protection violations rather than substantive due process violations. *See Crawford v. Davis*, 109 F.3d 1281, 1284 (8th Cir. 1997) (distinguishing *Sea Clammers* and finding "unpersuasive the [] argument that Title IX contains a sufficiently comprehensive remedial scheme") (quotation marks omitted); *Seamons v. Snow*, 84 F.3d 1226, 1234 (10th Cir. 1996) ("We agree with the Sixth Circuit [in *Lillard*], and conclude that [the plaintiff's] § 1983 action [to enforce independent constitutional rights] is not barred by Title IX."). The analysis employed by the Eighth and Tenth Circuits in those cases did not differ from the analysis of *Lillard* even though those courts were, like in the present case, considering the preemption of equal protection claims pursuant to

§ 1983. In sum, the question of whether Title IX is comprehensive enough to be exclusive is an inquiry that does not change regardless of the constitutional claim at issue.

The bottom-line argument of both our dissenting colleague and MHSAA is that we should not follow *Lillard*. MHSAA contends that the GVR commands us to reconsider, and thus overturn, that decision. The dissent likewise articulates its disagreement with the reasoning of *Lillard*, arguing that the second prong of the *Smith* inquiry must include consideration of not only the express remedies in Title IX, but also the remedies implied by the Supreme Court. We will address these arguments in turn.

MHSAA argues that "the clear implication of the Supreme Court's remand order is that it would like this Court to reconsider *Lillard*." The Supreme Court, of course, did not mention *Lillard* in the GVR. Nor did the Court address Title IX in either the GVR or in *Rancho Palos Verdes*, the case on which the GVR is based. Although MHSAA argues that *Rancho Palos Verdes* demands that we revisit *Lillard*, it fails to support its contention with any reasoned analysis. Instead, MHSAA simply recites the holding of *Sea Clammers*, acknowledges this court's holding in *Lillard*, and concludes that because *Rancho Palos Verdes* falls within the *Sea Clammers* line of cases, *Lillard* must be revisited.

MHSAA's own characterization of the *Sea Clammers* holding—"that specific statutory remedies displace the general private right of action under 42 U.S.C. § 1983 *when they are comprehensive enough to be exclusive*"— demonstrates why *Lillard* is still good law. The *Lillard* court acknowledged the *Sea Clammers* doctrine and held that it did not apply to Title IX because Title IX was not comprehensive enough to be exclusive. In other words, the *Lillard* court found that the dearth of remedies authorized in Title IX, either private or public, indicated that Congress did not intend to preclude recovery under § 1983 when it enacted Title IX. *See Lillard*, 76 F.3d at 723.

*Rancho Palos Verdes* did not alter the premise on which *Sea Clammers* was based and thus did not alter the vitality of *Lillard*. In *Rancho Palos Verdes*, as in the *Sea Clammers* and *Smith* cases, the primary question was whether Congress intended to foreclose reliance on § 1983. The Court in each of these cases focused on the extent of the rights and remedies provided in the statutory scheme. In those cases, the statutes at issue provided detailed means by which the private parties could seek redress, either through judicial or administrative channels. And in each of those cases, Congress neglected to explicitly authorize the types of remedies available under § 1983. The lodestar, in all cases, is what Congress intended. This court in *Lillard* addressed that precise inquiry as it related to Title IX and held that Congress did not intend to preclude recovery under § 1983. 76 F.3d at 723. "[U]nless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision," *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985), we remain bound by *Lillard*.

We see nothing in *Rancho Palos Verdes* that requires modification of *Lillard* or its reasoning, even though, as MHSAA notes, three other circuits have held that Congress intended Title IX to be exclusive. *See Bruneau v. South Kortright Cent. Sch. Dist.*, 163 F.3d 749, 756-59 (2d Cir. 1998); *Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 862-63 (7th Cir. 1996); *Pfeiffer v. Marion Ctr. Area Sch. Dist.*, 917 F.2d 779, 789 (3d Cir. 1990). Unlike this court in *Lillard*, the Second, Third, and Seventh Circuits declined to distinguish *Sea Clammers* on the basis that the Title IX cases concerned application of § 1983 to enforce independent constitutional rights rather than federal statutory law. *See, e.g.*, *Bruneau*, 163 F.3d at 757 ("We see nothing in *Sea Clammers* that would support a constitutional rights exception."). Those circuits also held that because the Supreme Court concluded that Title IX contains an implied damages remedy, *see Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992), Title IX "gives plaintiffs access to the full panoply of

judicial remedies." *See Waid*, 91 F.3d at 862-63 (holding that such access indicates Congress's intent to preclude reliance on § 1983).

On the other hand, MHSAA fails to recognize the cases from the Eighth and Tenth Circuits that have agreed with this court's holding in *Lillard*. *See Crawford*, 109 F.3d at 1284; *Seamons*, 84 F.3d at 1234. The fact that the courts of appeal are evenly split on the issue of whether Congress intended Title IX to provide a complete remedy bolsters the conclusion that the GVR in the present case did not imply that this court should reconsider *Lillard*. Even if the Supreme Court thought *Lillard* was wrongly decided and attempted to cure the defect through a GVR in the present case, the decisions of the Eighth and Tenth Circuits would be unaffected—meaning that the circuit split would continue.

Because we have determined that *Lillard* is controlling precedent, we need not extol its virtues in order to reach a decision in the present case. We nevertheless defend *Lillard*'s approach in response to the great weight that our dissenting colleague gives to *Cannon v. University of Chicago*, 441 U.S. 677, 689 (1979), in which the Supreme Court held that a private remedy was implicit in Title IX. Dissenting Op. at 24. The dissent also relies on *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 72 (1992), in which the Supreme Court relied on Congress's silence subsequent to the *Cannon* decision to hold that Congress "did not intend to limit the remedies available in a suit brought under Title IX." *Id.*; *Franklin*, 530 U.S. at 73. Although *Cannon* and *Franklin* relied on implicit evidence of congressional intent rather than the explicit text of Title IX, the dissent reasons that "[t]he [implied] intent found by the Supreme Court. . . should be given the same weight as expressed intent[]"—essentially arguing that the private damages remedy that the Supreme Court read into Title IX satisfies *Smith*. Dissenting Op. at 24. We respectfully disagree.

Although the Supreme Court read an implied remedy into Title IX in *Cannon*, 441 U.S. at 689, this implied remedy does not satisfy the second prong of the *Smith* inquiry. The Supreme Court has made clear that the question of what Congress intended is an inquiry focused on the statute itself. In *Smith*, for example, the Court referred to the "carefully tailored administrative and judicial mechanism *set out in the statute*." 468 U.S. at 1009 (emphasis added). The *Rancho Palos Verdes* Court also focused on the explicit text of the statute:

> Our cases have explained that evidence of such congressional intent may be found *directly in the statute creating the right*, or inferred from the *statute's creation* of a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983. . . . The provision of an *express*, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983.

544 U.S. at 120-21 (emphasis added). Although the Court later in its decision discusses the "availability of a private judicial remedy"—language that the dissenting opinion adopts—without making the distinction between explicit and implied remedies, the statute at issue in *Rancho Palos Verdes* (as well as in *Sea Clammers* and *Smith*) contains an explicit private remedy. We therefore read *Rancho Palos Verdes* as extending only to statutes that contain an explicit private remedy that is sufficiently comprehensive for us to infer that Congress intended the remedy to be exclusive.

Title IX does not satisfy this standard. The fact that the Supreme Court implied a private remedy in *Cannon* gives strength to the argument that Congress did not intend for the termination of federal funds—the only remedy explicitly authorized by Title IX—to serve as a comprehensive or exclusive remedy. *See* Michael A. Zwiebelman, *Why Title IX Does Not Preclude Section 1983 Claims*, 65 U. Chi. L. Rev. 1465, 1481-82 (1998). Rather, the Supreme Court held that an implied private right of action—in addition to the explicit remedy of termination of federal funds—was

necessary to achieve the fundamental purpose of Title IX. *Cannon*, 441 U.S. at 709. Whether Congress intended to create or foreclose a private remedy, as was at issue in *Cannon*, is decidedly different from the second prong of *Smith,* which asks whether Congress intended to create an enforcement scheme so comprehensive that it could serve as the *exclusive* avenue for relief, thus precluding claims under § 1983.

The Supreme Court's decision in *Franklin*, 503 U.S. at 66, does not undermine our analysis. *Franklin*'s conclusion was guided by the traditional presumption that all appropriate remedies may be implied in a statute unless Congress has explicitly indicated otherwise. *See id*. In other words, the Court relied on Congress's *silence* in implying the damages remedy in *Franklin*. *Id*. Congressional silence, though sufficient to find an implied remedy, cannot be equated with the carefully tailored remedies present in *Sea Clammers*, *Smith*, and *Rancho Palos Verdes*.

Justice Stevens's concurrence in *Rancho Palos Verdes* supports our determination that the *Smith* inquiry is distinct from the question of whether the Supreme Court may imply a private judicial remedy:

> Sometimes the question is whether, despite its silence, Congress intended us to recognize an implied cause of action. [citing *Cannon*, 441 U.S. 677]. Sometimes we ask whether, despite its silence, Congress intended us to enforce the pre-existing remedy provided in [42 U.S.C. § 1983]. *And still other times*, despite Congress' inclusion of specific clauses designed specifically to preserve pre-existing remedies, we have nevertheless concluded that Congress impliedly foreclosed the § 1983 remedy. [citing *Sea Clammers*, 453 U.S. at 13].

*Rancho Palos Verdes*, 544 U.S. at 129 (Stevens, J., concurring in the judgment) (emphasis added). The *Smith* inquiry, as highlighted by Justice Stevens, is not an offshoot of the inquiry performed in *Cannon*. *See also Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) ("[W]hether a statutory violation may be enforced through § 1983 is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute.").

In short, we cannot agree with our dissenting colleague that Title IX precludes relief under § 1983 simply because the Supreme Court has implied a private right of action. The Supreme Court has never held that an implied judicial remedy is enough to preclude relief under § 1983, and the caselaw does not support such a conclusion in the present case. The rationale on which *Lillard* was based, therefore, remains persuasive. Because we conclude that *Lillard* remains good law and is unaffected by *Rancho Palos Verdes*, CFE may seek remedies under § 1983 as well as under Title IX.

## C. Equal Protection Clause

### 1. State action

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." An entity or individual charged under § 1983 with a Fourteenth Amendment violation must be a "state actor." *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1111 (6th Cir. 1995) ("To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class.") (citation and

quotation marks omitted).  As a threshold issue, therefore, we must determine whether MHSAA is a state actor.

In determining that  MHSAA was a state actor, the district court relied upon the United States Supreme Court's decision in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001).  *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 178 F. Supp. 2d 805,  846-848 (W.D. Mich. 2001). The *Brentwood* Court addressed the issue of whether the Tennessee Secondary School Athletic Association (TSSAA), which was "incorporated to regulate interscholastic athletic competition among public and private secondary schools," engaged in state action when it enforced one of its rules against a member school.  *Brentwood Academy*, 531 U.S. at 290.  Because of "the pervasive entwinement of state school officials in the structure of the association," the Court held that the TSSAA's regulatory activity constituted state action. *Id.* at 291. The Court acknowledged that the analysis of whether state action existed was a "necessarily fact-bound inquiry," and noted that state action may be found only where there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Id.* at 295, 298 (citation and quotation marks omitted).

Public schools constituted 84% of TSSAA's membership, the Court noted, and public school faculty and administrators provided TSSAA's leadership. *Id.* at 298.  The Court was further influenced by the fact that TSSAA's primary revenue source was gate receipts from tournaments between TSSAA member schools. *Id.* at 299.  In conclusion, the Court stated that,

> to the extent of 84% of its membership, the Association is an organization of public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling. There would be no recognizable Association, legal or tangible, without the public school officials, who do not merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions in practical terms.

*Id*. at 299-300.  The Court also found significant that TSSAA ministerial employees were treated like state employees by virtue of their eligibility for membership in the state retirement system. *Id.* at 300.

MHSAA, like TSSAA, is comprised primarily of public schools, and MHSAA's leadership is dominated by public school teachers, administrators, and officials.  Students at MHSAA-member schools, like Tennessee students, may satisfy physical education requirements for high school by participating in MHSAA-sanctioned interscholastic sports.  Because MHSAA, like TSSAA, is so entwined with the public schools and the state of Michigan, and because there is "such a close nexus between the State and the challenged action," MHSAA is a state actor.  Tellingly, MHSAA argued earlier in this litigation, before the Supreme Court reversed the Sixth Circuit's opinion in *Brentwood Academy*, that "the nature and function of the MHSAA is virtually identical to that of the TSSAA." *Cmtys. for Equity,* 178 F. Supp. 2d at 847.  MHSAA, in sum, has failed to present any compelling argument to distinguish itself from TSSAA.  We therefore uphold the determination of the district court that MHSAA is a state actor.

### 2. *Denial of equal protection*

The Supreme Court has held that "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive' justification for that action." *United States v. Virginia*, 518 U.S. 515, 531 (1996) (dealing with the admission of women to the Virginia Military Institute, hereafter referred to as *V.M.I.*).  In *V.M.I.*, the Court further explained the state's burden under the heightened standard for gender-based classifications:

To summarize the Court's current directions for cases of official classification based on gender: Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is "exceedingly persuasive." The burden of justification is demanding and it rests entirely on the State. The State must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.

*Id.* at 532-33 (citation and quotation marks omitted).

The district court analyzed the scheduling of the Michigan athletic seasons under *V.M.I.*'s standard, determining that MHSAA had to show that scheduling team sports in different seasons based on gender "serves important governmental objectives and that this scheduling is substantially related to the achievement of those objectives." *Cmtys. for Equity*, 178 F.Supp.2d at 850. In addition, the district court noted that MHSAA's justifications must be "exceedingly persuasive." *Id.* MHSAA asserted that the scheduling decisions sought to maximize girls' and boys' participation in athletics, arguing that the scheduling system maximizes opportunities for participation "by creating optimal use of existing facilities, officials and coaches, thereby permitting more teams in a sport or more spots on a team." *Id.*

Conceding that MHSAA's logistical concerns were important, the district court concluded that MHSAA had failed to demonstrate, pursuant to the standards set forth in *V.M.I.*, that discriminatory scheduling was "'substantially related' to the achievement of those asserted objectives." *Id.* at 850-51. MHSAA's reliance upon anecdotal and "weak circumstantial" evidence was found insufficient to carry MSHAA's burden. The district court also pointed out that *even if* MHSAA had sufficiently proven their point about athletic participation opportunities, "that would not justify forcing girls to bear all of the disadvantageous playing seasons alone to solve the logistical problems." *Id.* at 851.

On appeal, MHSAA reiterates its argument made below that the purpose of separate athletic seasons for boys and girls is to maximize opportunities for athletic participation. MHSAA asserts that statistics showing that Michigan has a higher number of female participants in high school athletics than most states satisfies the requirements of *V.M.I.* It also argues that the "unavoidable consequence of separate teams was accommodation of twice the number of teams, games and participants." Although we acknowledge that schools in Michigan may have limited facilities, MHSAA's claim that the inadequate facilities require the female athletes to always play in the disadvantageous seasons is without merit. MHSAA could, after all, rearrange the schedules and require some of the male sports to play in disadvantageous seasons without increasing the overall use of the facilities.

The evidence offered by MHSAA, moreover, does not establish that separate seasons for boys and girls—let alone scheduling that results in the girls bearing all of the burden of playing during disadvantageous seasons—maximizes opportunities for participation. MHSAA simply states that bare participation statistics "are the link showing that separate seasons are substantially related to maximum participation." But a large gross-participation number alone does not demonstrate that discriminatory scheduling of boys' and girls' athletic seasons is substantially related to the achievement of important government objectives.

MHSAA also argues that it cannot be liable under the Equal Protection Clause because there is no evidence that MHSAA acted with discriminatory intent. It points out that "[t]here is no evidence that MHSAA [] scheduled [] sports seasons because of 'sexual stereotypes' or as a result of any discriminatory purpose or intent." This argument appears to confuse intentional discrimination—i.e., an intent to treat two groups differently—with an intent to harm. As stated above, equal protection analysis requires MHSAA to show that its disparate treatment of male and female athletes "serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *V.M.I.*, 518 U.S. at 532-33. MHSAA's justifications for its actions must also be "exceedingly persuasive." *Id.*

Disparate treatment based upon facially gender-based classifications evidences an intent to treat the two groups differently. *V.M.I.* imposes no requirement upon CFE to show that an evil, discriminatory motive animated MHSAA's scheduling of different athletic seasons for boys and girls. The cases that MHSAA cites to the contrary, such as *Hernandez v. New York*, 500 U.S. 352 (1991), are inapposite because they involve facially *neutral* classifications, rather than facially *gender-based* classifications. In *Hernandez*, for example, the Court analyzed a racially neutral explanation for a prosecutor's exercise of peremptory strikes, noting that "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 360. The facts of the present case are quite different from those of *Hernandez*, and proof of a discriminatory motive is not necessary.

MHSAA asserts, however, that the "only facial classification at work in this case was the original decision to have separate high school sports teams for boys and girls." Once the legality of separate programs has been conceded, MHSAA argues, issues regarding the implementation of those programs do not classify the players by gender. Conceding that separating boys and girls sports *is* a facial classification, MHSAA claims that other issues (scheduling, uniforms, coaches, etc.) are not prohibited facial classifications. If we were to find that any such difference between girls and boys sports is a facial classification, MHSAA argues, this would lead to absurd results. Facial classifications engender a presumption of discriminatory purpose, and MHSAA asserts that this is because there is typically a reason to infer antipathy—a reason, it claims, not present here.

MHSAA's characterization of the issue, however, misses the point. The issue is not whether *any* difference between male and female high school sports is deserving of being classified as a case of disparate treatment. Rather, the issue is whether the seasonal scheduling differences on the basis of gender that *result in unequal treatment* of women in comparison to men is considered disparate treatment. Disparate treatment does not arise from any and all differences in treatment; it occurs only where the offending party "*treats some people less favorably* than others because of their race, color, religion, sex, or national origin." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (emphasis added). Thus, the reason that scheduling differences properly receive disparate treatment analysis based on facial discrimination is not just because boys and girls are separated, but because they are separated and treated unequally in the scheduling of seasons.

In sum, MHSAA has failed to satisfy its burden of justifying its discriminatory scheduling practices under *V.M.I.* We therefore uphold the district court's grant of relief to CFE on the equal protection claim.

**D.      Title IX**

*1.      Applicability of Title IX*

Title IX, enacted as part of the Education Amendments of 1972, proscribes gender discrimination (with certain exceptions not applicable here) in educational programs receiving federal financial assistance. 20 U.S.C. § 1681(a). The statute provides, in pertinent part, that

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

Before Title IX was amended by the Civil Rights Restoration Act in 1987, the statute was construed by the Supreme Court in *Grove City College v. Bell*, 465 U.S. 555, 574-75 (1984), as being program specific, meaning that Title IX was interpreted as not providing institution-wide coverage. *See also Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 271 (6th Cir. 1994) (recounting the history of Title IX). Congress responded to the Supreme Court's holding in *Bell* by adding § 1687 to Title IX, which provides in pertinent part as follows:

> For the purposes of this chapter, the term "program or activity" and "program" mean all of the operations of –
>
> . . .
>
> (2) (B) a local educational agency, system of vocational education, or other school system; . . . *any part of which* is extended Federal financial assistance.

*Horner*, 43 F.3d at 271 (quoting 20 U.S.C. § 1687) (emphasis added by the court).

The legislative history concerning this amendment explains that Congress sought "to restore the broad scope of coverage and to clarify the application of title IX of the Education Amendments of 1972 . . . ." S. Rep. No. 64, 100th Cong., 2d Sess. 4, *reprinted in* 1988 U.S.C.C.A.N. 3, 6. As stated in *Horner*, "the definitions of 'program or activity' and 'program' make clear that discrimination is prohibited throughout entire agencies or institutions if any part receives Federal financial assistance." 43 F.3d at 271 (quoting S. Rep. No. 64, 100th Cong., 2d Sess. 4, *reprinted in* 1988 U.S.C.C.A.N. 3, 6) (quotation marks omitted).

MSHAA's brief on remand concedes that it is subject to Title IX. ("[MHSAA] represented to the Supreme Court that it would waive its argument that Title IX does not apply if the Court granted review of the preclusion issue. As a consequence, MHSAA does not now contest that it is subject to Title IX for purposes of this case."). Our only focus, then, is on whether MHSAA actually violated Title IX.

*2.      Intentional discrimination under Title IX*

MHSAA contends that the district court erred in finding that MHSAA violated Title IX because, according to MHSAA, CFE had to offer proof of discriminatory animus on MHSAA's part. But this argument lacks merit for the same reasons that MHSAA's analogous argument regarding equal protection, discussed above, lacks merit. The district court noted that a Title IX violation, like an equal protection violation,

> does not require proof that the MHSAA intended to hurt girls and chose the scheduling system as a way to do that. The Court's task is to analyze the resulting

athletic opportunities for girls and boys from the different treatment that they experience by being placed in different athletic seasons, and if girls receive unequal opportunities, Title IX has been violated.

*Cmtys. for Equity*, 178 F. Supp. 2d at 856. *Horner v. Kentucky High School Athletic Association*, 206 F.3d 685, 692 (6th Cir. 2000), relied upon by MHSAA, is inapposite because it addressed a facially neutral policy challenged under a disparate-impact theory. The policy challenged in *Horner* allowed the introduction of a new sport only if 25% of the member schools indicated a willingness to participate. This is quite different than the explicit gender-based scheduling policy in effect here. We therefore agree with the district court that proof of a discriminatory motive is not required for a Title IX claim based upon disparate treatment, and uphold its judgment in finding that MHSAA is in violation of Title IX.

## E.        Michigan's Elliott-Larsen Civil Rights Act

MHSAA's next argument addresses Michigan's Elliott-Larsen Civil Rights Act, M.C.L.A. §§ 37.2101-37.2804, which, among other things, proscribes gender discrimination in the provision of public services and public accommodations. M.C.L.A. § 37.2302(a). Section 37.2302(a) provides in pertinent part as follows:

Except where permitted by law, a person shall not:

(a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of . . . sex . . . .

The district court determined that MHSAA constitutes a "person" under the statute, defined as "[a]n individual, agent, association, corporation, . . . unincorporated association, the state or a political subdivision of the state, or any agency of the state, or any other legal or commercial entity." M.C.L.A. § 37.2103(g). MHSAA does not contest the conclusion of the district court on this point.

"Place of public accommodation" is defined in the statute as

a business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public.

M.C.L.A. § 37.2301(a).

And "public service" is defined as

a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof or a tax exempt private agency established to provide service to the public . . . .

M.C.L.A. § 37.2301(b).

MHSAA argues that the district court erred in finding that MHSAA serves as a "public accommodation" and provides a "public service." The case most directly on point on these issues is *Rogers v. International Association of Lions Clubs*, 636 F. Supp. 1476, 1479 (E.D. Mich. 1986), where the district court found that a Lions Club qualified as a place of public accommodation providing public services. The Lions Club qualified as "a place of public accommodation" because

its meetings are held in a public place (a Howard Johnson's restaurant), the meetings are open to the public, and the volunteer efforts of the Lions Club's members are made available to the public.  *Id*. As the district court noted, MHSAA sponsors championship athletic tournament events that are held in public places and open to members of the general public.  *Cmtys. for Equity*, 178 F. Supp. 2d at 859.  Competitions are also held in public places for which MHSAA facilitates the scheduling.

The district court in *Rogers* further considered whether the Lions Club provided a "public service." 636 F. Supp. at 1479.  After noting that the Club is a tax-exempt, nonprofit private agency whose stated purpose is to provide volunteer public service through its members, the court concluded that the Club provides a public service.  *Id.*  MHSAA is likewise a tax-exempt entity that provides a service to the public—"the organization of interscholastic athletics in the state's schools." *Cmtys. for Equity*, 178 F.Supp.2d at 859.  The district court therefore determined that MHSAA qualifies as providing a "public service" under Michigan law.

We conclude that the district court did not err in finding that MHSAA, like the Lions Club discussed in *Rogers*, qualifies as "providing a public service" and as a "place of public accomodation."  MHSAA's unsupported contentions to the contrary are not persuasive. It cites *Sandison v. Michigan High School Athletic Association*, 64 F.3d 1026, 1036 (6th Cir. 1995), for example, to support its argument that it is not a "place of public accommodation."  *Sandison*, however, is inapposite.  Although this court in *Sandison* held that MHSAA was not a "place of public accommodation" within the meaning of the Americans with Disabilities Act (ADA), that was because the ADA narrowly defines "a place of public accommodation" as a "facility."  *Id.* The ADA's definition differs from the broader definition under the Elliott-Larsen Civil Rights Act. Moreover, even if we were to hold that MHSAA is not a "place of public accommodation" under Elliott-Larsen, MHSAA would still be subject to the Act because it provides a "public service."  We therefore uphold the determination of the district court that MHSAA is in violation of Michigan's Elliott-Larsen Civil Rights Act.

## F.       Compliance plan

After finding that MHSAA's scheduling of high school athletic seasons violated the Equal Protection Clause of the Fourteenth Amendment, Title IX, and Michigan's Elliott-Larsen Civil Rights Act, the district court ordered MHSAA to "bring its scheduling of the seasons of high school sports into compliance with the law by the 2003-2004 school year." *Cmtys. for Equity*, 178 F. Supp. 2d at 862.  MHSAA was required to submit a compliance plan to the court by June 24, 2002. *Id.*

After MHSAA filed its proposed compliance plan, CFE and the Department of Justice  filed responses, arguing that MHSAA's plan failed to remedy the inequities that existed in the scheduling of Michigan's high school athletics seasons.  The Department of Justice noted that "the proposed Compliance Plan would perpetuate sex discrimination by requiring more than three times as many girls as boys to play in disadvantageous seasons and by addressing only sports, with the exception of boys' golf, offered by less than half of MHSAA's member schools."

In August of 2002, the district court rejected MHSAA's proposed plan as not achieving equality and offered MHSAA three options:

(1) combine all sports seasons so both sexes' teams play in the same season . . . and move girls' volleyball to its advantageous season of fall; or (2) reverse girls' basketball and volleyball; and in the Lower Peninsula, reverse two girls' seasons with two boys' seasons from among golf, tennis, swimming, and soccer; and in the Upper Peninsula, keep combined seasons in golf and swimming and reverse seasons in either tennis or soccer; or otherwise treat the Upper Peninsula the same as the

Lower Peninsula; or (3) reverse girls' basketball and volleyball; and in both peninsulas, combine seasons in two sports, and reverse seasons in one of the two remaining sports at issue.

MHSAA selected the second option in the amended compliance plan that it filed with the district court in October of 2002.

Although MHSAA argues that the district court erred in rejecting its initial compliance plan, we must determine whether appellate jurisdiction exists to hear the issue before we can address the merits of this argument. CFE contends that MHSAA failed to appeal the compliance-plan order because MHSAA's January 2002 notice of appeal references only the opinion, judgment, and injunctive order entered in December of 2001. MHSAA did not file an amended notice of appeal following the district court's rejection of MHSAA's initial compliance plan in August of 2002.

We lack jurisdiction over issues that are the subject of post-judgment motions when those issues are not included in a notice of appeal. In *United States v. Warner*, 10 F.3d 1236 (6th Cir. 1993), for example, this court held that "by being a distinct appealable order from which a separate appeal must be taken," a denial of a motion for new trial

> is subject to the requirement that the appeal be taken within ten days from the docketing of the district court's order. Absent an appeal within this time, or an extension from the district court for filing the notice of appeal, this court, being without authority to extend the time for filing a notice of appeal, will lack the jurisdiction to hear the appeal.

*Id.* at 1240. Because MHSAA did not file an amended notice of appeal following the district court's rejection of the initial compliance plan, we have no jurisdiction to consider MHSAA's argument concerning the same.

## G.     Judge Enslen's refusal to recuse himself

In 1983, MHSAA filed suit against the United States Department of Education and the Office of Civil Rights in the case of *Michigan High School Athletic Association v. Bell*, No. 83-CV-6250-AA (E.D. Mich. 1983), seeking a declaratory judgment and injunctive relief. Judge Enslen, the district court judge in the present case, recused himself from the 1983 case for reasons that no one, including Judge Enslen, can presently recall. MHSAA nevertheless argues that because Judge Enslen recused himself then, he should have recused himself now.

The evidence of record does not explain why Judge Enslen recused himself from the 1983 case. And in denying MHSAA's motion for disqualification in this case, Judge Enslen stated that he could think of no reason why he would be unable to remain impartial. Judge Enslen also noted that "only one of the 21 Defendants in the current case was a party to the 1983 case, and none of the class Plaintiffs in the current case was involved in the 1983 case." Because MHSAA failed to provide any valid basis for Judge Enslen's recusal, we uphold the ruling of the district court denying its motion. *See Person v. General Motors Corp.*, 730 F.Supp. 516, 518-19 (W.D.N.Y. 1990) (stating that a judge's recusal in a prior case involving a party is not alone sufficient for disqualification in a later case involving that party).

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

### CONCURRING IN PART, DISSENTING IN PART

---

KENNEDY, Circuit Judge, concurring in part and dissenting in part.  I agree with the majority's holding that MHSAA's scheduling of high school athletic seasons violates Title IX and the Elliot-Larsen Civil Rights Act. I write separately because I do not believe we are bound by the holding in *Lillard* and thus, the question of whether Title IX supplants equal protection claims brought pursuant to § 1983 is one of first impression in this circuit.  After applying the test in *Smith v. Robinson*, and having due regard for the Supreme Court's direction that this case was to be "remanded...for further consideration in light of *Rancho Palo Verdes v. Abrams*" ("*Rancho*"), I conclude that Title IX supplants plaintiffs' gender-based equal protection claims brought pursuant to § 1983.

I.       *The Effect of Lillard*

The majority finds that *Lillard v. Shelby County*, 76 F.3d 716 (6th Cir. 1996),  is controlling and thus that the issue of whether Title IX supplants an equal protection claim brought pursuant to § 1983 has already been decided.  Yet, the majority fails to distinguish the type of  claims brought pursuant to § 1983.  In *Lillard*, the issue was not whether Title IX precluded an *equal protection* claim, but whether it precluded a *substantive due process* claim.

*Lillard* was a sexual harassment case. This case is one of sexual discrimination.  In *Lillard* the issue was whether Title IX precluded substantive due process claims brought pursuant to § 1983. In this case, the issue is whether Title IX precludes equal protection claims brought pursuant to § 1983.  This is a key difference and one deserving of a separate analysis.  As explained by one scholar:

> A victim of sexual harassment by a teacher would have several constitutional Section 1983 claims against the teacher and the school district. She might bring claims based on: (1) the Fourteenth Amendment right to due process, alleging a denial of a fair hearing in which to bring her complaint; (2) *the liberty interest in bodily integrity under the substantive due process right in the Fourteenth Amendment*; and (3) *the right under the Equal Protection Clause of the Fourteenth Amendment to be free from discrimination on the basis of sex*. Because Title IX confers on plaintiffs a right to be free from discrimination on the basis of sex, the plaintiff's third Constitution-based Section 1983 claim is "virtually identical" to the right conferred by Title IX...

> A court confronted with these remaining Constitution-based Section 1983 claims must determine whether either claim is virtually identical to the right under Title IX against discrimination on the basis of sex...[N]either procedural nor substantive due process rights are identical to, or even virtually identical to, rights under Title IX, which affords protection against discrimination on the basis of sex.  Consequently, if a plaintiff brings procedural and substantive due process claims under Section 1983, those claims would not be precluded by Title IX, for they do not satisfy the first prong of the Smith test.

Zwibelman, Michael, WHY TITLE IX DOES NOT PRECLUDE SECTION 1983 CLAIMS, 65 U. Chi. L. Rev. 1465, 1479 (Fall 1998); *see also* Burke, Beth, TO PRECLUDE OR NOT TO PRECLUDE, 78 Wash. U. L.Q. 1487, 1512 (noting that some courts fail to apply properly the "virtually identical" prong of the Smith test by "combin[ ing] all the alleged constitutional violations without analyzing each

claim separately under the *Smith* test"). While this is just one scholar's view regarding which type of constitutional claims should be precluded, it demonstrates the problem: this circuit has previously determined that due process claims are not "virtually identical" to Title IX claims, but we have not yet held that equal protection claims are not "virtually identical" to Title IX claims.

I believe we are required to do such a separate analysis under the Supreme Court's decision in *Smith v. Robinson*. 468 U.S. 992 (1984). In *Smith*, the petitioners alleged violations of the Education of the Handicapped Act ("EHA") and of *both* equal protection and due process. Tellingly, the Court did not combine the alleged due process and equal protection violations in its discussion of preclusion; rather, the Court was prepared to analyze each claim separately. The Court first found that EHA claims were virtually identical to the claims brought under the Equal Protection Clause and that Congress intended that equal protection claims be precluded. Next, the Court was prepared to separately address "whether the procedural safeguards set out in the EHA manifest Congress' intent to preclude resort to § 1983 on a due process challenge." *Id.* at 1013-1014. However, the Court found such analysis "unnecessary" because, even if the petitioners could maintain a due process challenge, they were not entitled to attorney's fees. The opinion in *Smith* illustrated that for each constitutional claim, a court must engage in a separate analysis of whether that claim, provided for by a statutory remedy, is precluded from being brought under § 1983, another statutory remedy.

Even though *Lillard* addressed the preclusion of different right, the majority holds we are bound by it. I see several problems with not addressing the precise issue before us. First, it contradicts the procedure set forth by the Court in *Smith*. For, if finding what Congress intended with respect to one constitutional claim - say equal protection - is enough to find what Congress intended with respect to all constitutional claims, then why was the Court prepared to do two separate analyses?[1] In other words, if the majority's position is correct, that a holding that Congress did not intend a statute to be the "exclusive avenue" for bringing one type of constitutional claim applies to all constitutional claims brought pursuant to § 1983, then, according to the majority, the Supreme Court was prepared to engage in a meaningless exercise of addressing whether "the procedural safeguards set out in the EHA manifest Congress' intent to preclude resort to § 1983 on a due process challenge." *Id.* According to the majority view, the Court had already decided this issue when it discussed what Congress intended with respect to equal protection claims.

Secondly, to say that what Congress intended with respect to one type of constitutional claim is what Congress meant with respect to all, is an overly-simplistic justification for the majority's decision. When ascertaining Congress' intent, I believe we have to do so with the precise rights in mind. I do not think one can assume that simply because Congress did not intend to preclude substantive due process claims, it did not intend to preclude equal protection claims. It seems clear to me that Congress could intend to preclude one type of constitutional claim, by providing a statutory remedy for it, but not others.

---

[1]The majority answers this question by acknowledging that the *Smith* Court "did in fact contemplate two separate analyses," but by reasoning that a separate analysis was warranted in *Smith* - and not in this case - because there was a "clear textual indication" in the EHA that Congress intended for that statute to preclude equal protection claims brought pursuant to § 1983. Op. at 9. By distinguishing *Smith* in this way, the majority is treating implied rights as second-class rights as they are undeserving of a separate analysis. The Court has not indicated in either *Smith* or *Sea Clammers* that implied rights are to be treated differently than express and I decline to do so here. For, as I explain later, once we include the implied rights to bring individual actions, including damages, as what Congress intended and read Title IX to so provide, Congress has provided a statutory remedy for gender-based equal protection claims so that § 1983 is not available for equal protection actions.

In *Lillard* this court found the claims at issue were not "virtually identical" to those provided in Title IX. *Lillard*, 76 F.3d at 723. I agree, as the plaintiff in *Lillard* alleged sexual harassment and Title IX was designed to target gender discrimination. While I recognize the court in *Lillard* summarily concluded these claims were not "virtually identical," that does not take away from the fact that because the claims were so different, there is further reason to assume Congress did not intend to preclude the use of § 1983. Similarly, where the claims are "virtually identical," as I believe they are in this case, there seems to me more reason to assume Congress intended to preclude use of § 1983 to enforce those claims. Thus, when a court finds the first part of the *Smith* test is not satisfied (are the claims virtually identical), the answer to the second (did Congress intend that the statute supplant the constitutional claims), seems obvious. It only makes sense to conclude that when a constitutional claim is not virtually identical to the statutory claim, Congress did not intend to preclude the former.

Third, it is important to point out that the court in *Lillard* did not indicate its holding was to be extended to the preclusion of rights other than substantive due process. The court in *Lillard* concluded that the rights were not "virtually identical" but then went on to discuss, at length, congressional intent. The court reasoned that because the private right of action found in Title IX was implied, rather than express, Congress did not intend to preclude due process claims when it enacted Title IX. There was no indication that this logic regarding implied rights was meant to extend to other constitutional rights beyond substantive due process. The court limited its finding, stating, "the *National Sea Clammers* doctrine presents no impediment to the plaintiffs' pursuit of remedies for alleged violations of *substantive due process*." *Lillard*, 76 F.3d at 724 (emphasis added). More importantly, the court indicated its finding regarding congressional intent was dicta, concluding that, "*even if* the defendants' argument had been directed at an attempt by the plaintiffs to enforce their Title IX rights, rather than their constitutional rights, through section 1983, *National Sea Clammers* would have provided no support." *Lillard*, 76 F.3d at 723 (emphasis added).[2]

For the foregoing reasons, I believe that we need to engage in a separate analysis as required by the Supreme Court in *Smith* and that we must address this issue as one of first impression in this circuit.

II.      *Applying Smith v. Robinson's Two-Prong Test*

In *Smith*, the Supreme Court established a two-prong test for determining whether § 1983 claims predicated on constitutional rights are precluded by statute: first, courts must address whether the rights underlying the § 1983 claim are "virtually identical" to the rights in the relevant statute; second, courts must address whether Congress intended the statute to be the "exclusive avenue" for asserting those rights. 468 U.S. at 1009. As discussed, I believe the rights conferred

---

[2]The defendants in *Lillard* argued that due process claims brought pursuant to § 1983 should be precluded by Title IX under the *Sea Clammers* doctrine. The *Lillard* court pointed out that *Sea Clammers* did not apply to the preclusion of constitutional claims, only the preclusion of statutory claims, stating:

> There are two important distinctions that make the *National Sea Clammers* doctrine inapposite here. First, and most crucial, is the fact that in *National Sea Clammers,* the plaintiffs' section 1983 action sought to enforce the rights created by federal statutes which did not provide for a private right of action, while here, the plaintiffs' section 1983 claims are premised on alleged *constitutional* violations. Thus, while in *National Sea Clammers,* allowing the section 1983 action to enforce the rights at issue would have effectively circumvented the implicit congressional intention to foreclose private rights of action, here, the plaintiffs' section 1983 action does not attempt either to circumvent Title IX procedures, or to gain remedies not available under Title IX...Instead, the plaintiffs seek to enforce wholly independent, and totally distinct, substantive due process rights.

*Lillard,* 76 F.3d at 722-723 (citation omitted).

in Title IX - to be free from discrimination on the basis of sex - are virtually identical to those granted in the Equal Protection Clause. The next issue then, and the one requiring further analysis, is whether Congress intended Title IX to be the "exclusive avenue" for bringing those gender-based equal protection claims. In other words, by enacting Title IX, did Congress intend to preclude reliance on § 1983, a separate statute, to remedy an equal protection violation? *Smith*, 468 U.S. at 1012.

As a preliminary matter, I want to express my disagreement with the rationale behind one holding in *Lillard* that Title IX does not supplant due process claims brought pursuant to § 1983. The court reasoned that because the private right of action was *implied* rather than express, Congress did not intend it to be the exclusive avenue for bringing constitutional claims. I find this reasoning unpersuasive for two reasons. First, I believe it undermines the Supreme Court's decision in *Cannon v. University of Chicago*, 441 U.S. 677 (1979). In *Cannon*, the Court found Congress intended to create a private judicial remedy in Title IX and we should not second-guess that holding. The intent found by the Supreme Court, although implied, should be given the same weight as expressed intent. Second, the opinion in *Lillard* is silent with respect to the fact that *after* the Supreme Court's holding in *Cannon*, but prior to the decision in *Lillard*, Congress essentially ratified the Supreme Court's holding in *Cannon* by subsequently enacting two legislative provisions which did not interfere with the implied right, the Civil Restoration Act of 1987 and the Rehabilitation Act Amendments of 1986. This point was acknowledged by the Supreme Court in *Franklin v. Gwinnett County Public Schools*, where the Court held a person could receive both compensatory and punitive damages in a private action for sex discrimination. *Franklin*, 503 U.S. 60, 72 (1992). The Court noted that while Congress had an opportunity to abrogate the implied right of action found in *Cannon*, it remained silent stating, "[o]ur reading of the two amendments to Title IX enacted after *Cannon* leads us to conclude that Congress did not intend to limit the remedies available in a suit brought under Title IX," *id.*, and later that:

> In seeking to correct what it considered to be an unacceptable decision on our part in *Grove City College v. Bell*, Congress made no effort to restrict the right of action recognized in *Cannon* and ratified in the 1986 Act or to alter the traditional presumption in favor of any appropriate relief for violation of a federal right. We cannot say, therefore, that Congress has limited the remedies available to a complainant in a suit brought under Title IX.

*Id.* at 73. Thus, I am not persuaded by the argument that because the private right of action in Title IX was implied by the Supreme Court, this court is prevented from finding Congress intended Title IX to supplant gender-based equal protection claims. With this in mind, I now address whether Congress intended to preclude equal protection gender-based §1983 claims.

In ascertaining Congress' intent in this case, I believe we should first look to the decision the Supreme Court asked us to consider on remand, *Rancho Palo Verdes*. 125 S.Ct. 1453 (2005). I agree with the majority's finding that the case before us is a *Smith* case rather than a *Sea Clammers* case in that it deals with both constitutional and statutory rights. Further, I agree that *Rancho* is a *Sea Clammers* decision. However, I still believe that we should consider the Court's holding in *Rancho*, specifically, the potential reach of the Court's holding.

Prior to *Rancho*, courts applied no inference regarding congressional intent. The Court in *Rancho* changed that and, where a judicial remedy exists in a statute, made it much easier to infer that Congress intended to preclude reliance on § 1983. While the Court declined to hold that the "availability of a private judicial remedy...conclusively establishes a congressional intent to preclude § 1983 relief," *id.* at 1459, the Court did state that the availability of such a remedy in the statute would give rise to an, "*ordinary inference* that the remedy provided in the statute is exclusive," but

such an inference, "can surely be overcome by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983" *id.* at 1459 (emphasis added). Again, I recognize that factually *Rancho* is analogous to *Sea Clammers* in that it involved two statutes. However, worth mentioning, is the fact that the reasoning behind this inference was not limited to *Sea Clammers* cases. Rather, the Court spoke at length about *both Sea Clammers* and *Smith* in articulating this rule:

> We have found § 1983 unavailable to remedy violations of federal statutory rights in two cases: *Sea Clammers* and *Smith.* Both of those decisions rested upon the existence of more restrictive remedies provided in the violated statute itself...
>
> The Government as *amicus,* joined by the City, urges us to hold that the availability of a private judicial remedy is not merely indicative of, but conclusively establishes, a congressional intent to preclude § 1983 relief. We decline to do so.

*Rancho Palos Verdes,* 125 S.Ct. at 1459 (citations omitted). Because the Court analyzed *Sea Clammers* (only statutory claims) and *Smith* (statutory and constitutional claims) and their progeny and found that in both types of cases the pivotal issue was whether the statute at issue provides for a private judicial remedy, the discussion leading up to the establishment of the inference adopted in *Rancho* suggests that it does not apply solely to *Sea Clammers* cases. There is an argument that such an inference applies to *Smith* cases as well. Yet, as this case can be decided under the standard set forth in *Smith,* I find it unnecessary to apply the *Rancho holding* to decide this case; however, I believe the *reasoning* in *Rancho* suggests we should conclude that Congress, by enacting Title IX, intended to preclude reliance on § 1983 as a remedy for an equal protection claim.

Again, under the test in *Smith*, we must ask whether Congress intended Title IX to be the "exclusive avenue" through which a plaintiff may assert an equal protection claim. I believe we must address this question with the relevant Supreme Court decisions in mind. In *Cannon*, the Supreme Court applied the four-factor test of *Cort v. Ash*, 422 U.S. 66, 78 (1975), to hold that Title IX created a private right of action. The second *Cort* factor asks whether "any indication of legislative intent, explicit or implicit, either to create a remedy or deny on" exists. *Id.* The court in *Cannon* found that,"[f]ar from evidencing any purpose to deny a private cause of action, the history of Title IX rather plainly indicates that Congress intended to create such a remedy." *Cannon*, 441 U.S. at 694. In *Franklin*, the Court went on to hold that "Congress did not intend to limit the remedies available in a suit brought under Title IX." *Franklin*, 503 U.S. at 72. Finally, in *Rancho* the Court established the above-discussed inference. Again, while we need not extend the *Rancho* holding to *Smith* cases, I believe the *reasoning* sheds some light on how we should dispose of the case before us. As emphasized by the Supreme Court, the central issue in both *Smith* and *Sea Clammers* cases has been, and is, whether the statute at issue provides for a judicial remedy:

> [I]n *all* of the cases in which we have held that § 1983 *is* available for a violation of a federal statute, we have emphasized that the statute at issue, in contrast to those in *Sea Clammers* and *Smith, did not* provide a private judicial remedy (or, in most cases, even a private administrative remedy) for the rights violated.

*Rancho,* 125 S.Ct. at 1459. Title IX, like the statutes at issue in *Sea Clammers* and *Smith*, does provide for both a private right of action and for damages. Thus, because the Supreme Court has held Congress intended to create a private judicial remedy in Title IX, and because the non-existence of such a remedy has repeatedly given rise to a finding that Congress did not intend to preclude relief sought through § 1983, I would hold that Congress did intend for Title IX to be the "exclusive avenue" through which a plaintiff may assert a gender-based equal protection claim.