NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0369n.06

No. 19-5846

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| KESHIA CLEMONS, as mother and next friend of T.W., | ) ) ) | **FILED** Jun 22, 2020 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) |  |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| SHELBY COUNTY BOARD OF EDUCATION; SCOTT RICKE; JOHN LEEPER; JAMES NIEHOF, Superintendent, | ) ) ) ) |  |
| Defendants-Appellees. | ) |  |

BEFORE: CLAY, COOK, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Plaintiff Keshia Clemons brought this action on behalf of her minor daughter, T.W., against the Shelby County Board of Education (SCBE) and school officials and staff, alleging that T.W. had been discriminated against based on her gender and her diagnosis of Asperger's Syndrome while she was a student athlete at Martha Layne Collins High School (MLCHS). Clemons brought claims under Title IX, Section 504 of the Rehabilitation Act, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Kentucky Constitution. The district court granted summary judgment for defendants on all claims, and Clemons appeals. We AFFIRM the grant of summary judgment to Defendants on Clemons's Title IX, gender-based equal protection, and disability-based equal protection claims, and REVERSE the grant of summary judgment to Defendants on Clemons's Section 504 claim and remand for further proceedings.

**BACKGROUND**

**I.    Factual Background**

This dispute arose out of a series of events related to T.W.'s participation on the Martha Layne Collins High School (MLCHS) tennis team during the 2013-2014 and 2014-2015 school years. MLCHS is one of two high schools in Shelby County, Kentucky, and is governed by SCBE. At all times relevant to this dispute, Defendant James Neihof was SCBE Superintendent, Defendant John Leeper was Principal of MLCHS, and Defendant Scott Ricke was employed as the coach of MLCHS's girls' tennis team.

According to Clemons, T.W. has always experienced anxiety and has struggled socially. When T.W. began attending MLCHS as an eighth grader in the fall of 2013, the new environment and size of the school greatly exacerbated her anxiety. T.W.'s parents sought professional help at Seven Counties Services, Inc. of Shelby County (Seven Counties). On February 10, 2014, a psychiatrist at Seven Counties diagnosed T.W. with Asperger's Syndrome Disorder[1] and anxiety. Clemons did not report the diagnosis to the school or request special education services at that time.

The 2013-2014 MLCHS girls' tennis season commenced under the direction of a new coach, Scott Ricke. Ricke at first considered holding competitive tryouts for the team, but decided against it after Principal Leeper told him that MLCHS usually had a difficult time turning out students for sporting events and explained that he was glad the girls' tennis program was growing. Fourteen girls were on the team that year, including T.W.

---

[1] Asperger's Syndrome Disorder is "a condition on the autism spectrum characterized by impaired social skills. Children with Asperger's disorder lack awareness of social boundaries, among other things, and as a result can unwittingly engage in inappropriate behavior." (R. 47, p. 2 n.2 (quoting *Estate of Barnwell v. Watson*, 880 F.3d 998, 1001 (8th Cir. 2018)).)

The tennis season began with conditioning. T.W., who was in her third year playing tennis for MLCHS, immediately had a difficult time with the new coach and often had panic attacks after practice. T.W. testified that Ricke would "embarrass [her] in front of [her] teammates," telling her that she "jump[ed] funny" or making her jump in front of the team. (R. 35-2, PID 154.) Ricke testified that T.W. would have "[m]eltdowns that would happen very quickly if she didn't get her way" and that "if she was uncomfortable with [the situation] she would just like run off the court." (R. 35-8, PID 255.) He testified that T.W. was unable to handle "any sort of thing approaching criticism" and that suggestions for trying things differently were "all very personal to her." (*Id.* at PID 262.)

Clemons first told Ricke of T.W.'s Asperger's diagnosis after a particularly difficult practice on February 17, 2014. Ricke told Clemons that he had a son with autism and that T.W.'s diagnosis made sense to him. They had "a 30- or 45-minute conversation in which [Ricke] sounded very sincere in his belief that he could help T." (R. 41, PID 603.) Sometime after that conversation, Clemons began attending practice because she believed that Ricke had not changed his approach with T.W. Clemons stated that when Ricke did speak to T.W., he would "tell[] her she was bad at everything" despite Clemons having already told Ricke that T.W. needed positive reinforcement. (*Id.* at 615.) She stated that Ricke "did this with many of the other girls as well, however the other girls did not have a disability that would cause them to shut down as a direct reaction to this type of behavior." (R. 35-9, PID 1062.)

Clemons had other issues with Ricke's coaching methods. In a letter she gave to Superintendent Neihof at the end of the 2014 season, Clemons explained that it was "obvious that Mr. Ricke had not become the coach of the high school girls' team to actually coach. He came to socialize." (*Id.*) Clemons observed that at practice Ricke "would ignore T." to talk to girls who

"smiled more or were cheerful." (R. 41, PID 614.) Clemons testified that Ricke also ignored T.W. at matches. However, she does not know whether Ricke coached or actively corrected other players during matches.

At the end of April, Ricke decided to have T.W. play her teammate, R.S., in a challenge match to determine which of them would play at regionals. Challenge matches allowed players to challenge other players for their seed[2] and occurred throughout the season. Ricke explained that "athletically and just ability wise I felt [R.S.] kind of passed TW and a couple of other players. So going into the regions I wanted to give TW an opportunity to hold her spot if she wanted and play that challenge match." (R. 35-8, PID 255.)

R.S. won the match. At practice on May 1—from which T.W. was absent—Ricke told the team that R.S. would be playing at regionals and T.W. would not. Ricke gave Clemons this news over text message on May 2, but Clemons did not tell T.W. because she wanted Ricke to tell her himself. Clemons was "floored" because her understanding was that T.W.'s spot at regionals was already secured. (R. 35-9, PID 1067-68.) Clemons testified that she "believe[d] that his choice was discriminatory and the reason why he did it is because he was tired of dealing with T." (R. 41, PID 638.)

Before Ricke could tell T.W. that she would not be playing at regionals, T.W. heard it from another girl on the team. T.W. texted Clemons and stated that if she died, Clemons should blame Ricke. Clemons immediately called Ricke and told him about the message, and T.W. was pulled from class to speak with the school's administration. When Clemons arrived at the school, she explained to the administrators her frustrations about the year and told them for the first time about T.W.'s Asperger's diagnosis.

---

[2] "Seed" refers to players' rank. The best player played number one singles, the second played number two singles, and so on. The same rankings applied to doubles players. (R. 35-2, PID 153.)

Before practice started that afternoon, T.W. approached Ricke and asked to talk with him about why she would not be playing at regionals. He told her to wait until practice was over and they could have a private conversation. T.W. then approached Ricke again, said a couple of sentences, and ran to Clemons's car crying. Clemons perceived this as Ricke "blatantly ignor[ing]" T.W. and became angry. (R. 35-9, PID 1068.) Clemons and a friend approached the fence near the court and, according to Ricke, "were yelling at [Ricke] and crying." (R. 41-2, PID 872.) They told him they thought it was unfair he was letting R.S. play because she cheated. Ricke testified that Clemons yelled, "I know you have an autistic son. I hope this happens to him, only twice as bad. Karma baby." (*Id.* at PID 873.) Clemons admitted confronting Ricke and being very angry with him but denied making that statement.

Clemons withdrew T.W. from MLCHS the next day and homeschooled her for the remainder of the academic year. Later in May, Ricke sent out a text message reminder to the team about the tennis banquet at the end of the month but did not send a text to Clemons. However, T.W. heard about the banquet from another player, and she and Clemons decided to attend. Clemons perceived that Ricke did not want T.W. at the banquet because when it came time to talk about each of the players, he only talked about T.W.'s wins and losses and stated that "she started off the year good." (R. 35-9, PID 1070.)

On June 11, Clemons sent a letter to Superintendent Neihof detailing the events of the tennis season and explaining that she believed Ricke had harassed and bullied T.W. in violation of Section 504 of the Rehabilitation Act. Neihof forwarded Clemons's concerns to Principal Leeper and responded to Clemons that he was not aware of a Section 504 plan but hoped T.W. would enroll and play tennis the following year.

Clemons reenrolled T.W. at MLCHS for the 2014-2015 academic year. On October 15, 2015, at Clemons's request, the school held a meeting to discuss accommodations for T.W. The support team included T.W.'s therapist, teachers, school counselor, and Clemons. They discussed T.W.'s anxiety and difficulty accepting feedback. They also discussed strategies for communicating with T.W., including giving positive reinforcement, and recommended regular check-ins with the school counselor. At a follow-up meeting on January 27, 2015, the team determined that T.W. should have a formal plan under Section 504. The plan did not include accommodations for tennis at that time.

Sometime in February 2015, Clemons, T.W., Ricke, the MLCHS assistant principal, and the athletic director met to discuss the events of the previous tennis season. Clemons apologized to Ricke for her behavior during the "blowup" at the end of the year. (R. 41-2, PID 875.) Ricke stated that during that meeting, T.W. was "very fixated" on not making regionals and was upset with him. (*Id.* at PID 880-81.)

In early February, Ricke distributed handbooks to students interested in playing for the girls' tennis team in the upcoming season. The handbook stated that interested players would be required to try out over three days and that some players may be cut due to limited space. It explained that players would be evaluated based on ability, coachability, commitment, attitude, team chemistry, and future potential for the team.[3] Ricke later explained that he decided to hold tryouts and cut girls that year because limited court space during the previous season had created "a big problem."[4] (*Id.* at 877.) Court space was not an issue on the boys' team because fewer

---

[3] Clemons believed that Ricke included those criteria so that he would "have an excuse to cut T" because some of the criteria he used, like coachability, were skills that he had stated T.W. lacked the year before. (R. 41, PID 699-700.)

[4] The MLCHS boys' and girls' teams shared six courts with the boys' and girls' teams from the other high school in Shelby County. The limited number of courts and daylight hours limited players' practice time and resulted in matches where some students did not get the opportunity to play.

boys signed up for tennis; in the 2013-2014 season, the boys' coach had difficulty filling the boys' roster and ultimately fielded a team of eight players. In contrast, the 2013-2014 girls' team originally had fourteen players.

Ricke testified that he had already decided that T.W. would not make the team before tryouts occurred. He testified he "felt like last year was going to be a very big issue and still on her mind a lot, so much so that I don't feel like she could get past it and even have a productive year . . . and there were a lot of girls who were just concerned about the team disruptions and those types of things." (*Id.* at 881.) He cited the incident where Clemons yelled at him at the end of the year, and incidents during other practices where T.W. became very upset and threw rackets at him. He testified that he was concerned for T.W. and "really felt it was in the best interest of TW to not be on that team because I was, to be honest, I was fearful that if she didn't make regions, which was a high probability, that she would threaten suicide again, or, in fact, actually do it." (*Id.*) He stated that he had "the whole team to think about" and that he "didn't get any indication" that "it could have been a positive experience for her going forward." (*Id.*)

T.W. came to the first day of tryouts, which were held in the school gymnasium. Ten or twelve girls were present. Ricke testified that T.W. performed poorly on "forehand, backhand, footwork . . .[and] volleys." (*Id.* at 878.) He also said that based on the previous year, he did not consider T.W. coachable. Ricke gave T.W. a score of two (out of five) on her forehand, explaining that "[s]he was very distraught around me at really all points, and really just every time I fed her a ball it seemed like it went in the wrong direction." (*Id.* at 880.) T.W. testified that Ricke hit the balls to her at a faster speed than he did the other girls.

According to Ricke, when T.W. saw her score, "she ran away screaming and crying." (*Id.* at 880.) He stated that he wanted to talk with her, but she kept coming in and out of the gym and

7

he still had other girls to evaluate. After tryouts, Ricke spoke with Clemons and told her that T.W. did not make the team.[5] He expressed to Clemons that he "was concerned that she had her come out after all the concerns of the year before." (*Id.*)

Clemons asked that the school investigate the tryout process. Leeper asked Assistant Principal Angela Deckard to investigate. Deckard concluded that tryouts were equitable but that "the tryout process was not adequate for eliminations" because, due to the weather, the girls were not playing in their normal environment and were unable to play head-to-head matches. (R. 35-16, PID 322.) Leeper met with Clemons on March 20 to share the results of the investigation with her and tell her that T.W. would be given a spot on the team.

On March 27, school officials and Clemons met to discuss accommodations for tennis. Notes from the meeting included the following:

> Mrs. Clemons shared her concerns which include: T.W.'s anxiety and fears with being around coach, focus on negative statements, and social interaction in the team environment. . . . Mrs. Oakley shared some ideas including: Mrs. Graney can focus on working with T.W. on receiving feedback. Mrs. Clemons said that it's better for T.W. receives [sic] constructive feedback such as always starting feedback with a positive statement and then follow with ways to improve. . . . Mrs. Graney could then provide feedback to the coaches with T.W.'s perception to help that relationship. In terms of social interactions, Mrs. Clemons shared that a peer or buddy on the tennis team could help her by modeling positive group interactions.

(R. 35-17, PID 327.) The support team decided to add a peer mentor to T.W.'s accommodations to provide her with extra support and a model for positive interactions in tennis. They also decided that Mrs. Graney, T.W.'s counselor, would attend tennis practice to observe Ricke giving

---

[5] Ricke also cut two of T.W.'s younger sisters. There is no discussion in the record regarding why the sisters were cut. Ricke also stated that "[t]here were about three or four other girls that were supposed to show up that I don't think would have made it." (R. 41-2, PID 879.)

feedback. The meeting notes concluded that "[a]t this time, mom felt additions address her concerns. Mom can request a meeting any time to request revisions." (*Id.* at 328.)

Before her first week with the team, T.W. was given a sheet created by Ricke entitled "T.W.'s Week of Tennis" to help alleviate her anxiety. (R. 35-19, PID 334.) The sheet stated that on Tuesday through Thursday of that week, T.W. would play challenge matches, which could be spread out depending on time. Ricke testified that T.W. would be on the team regardless of how she played in the challenge matches. He asked T.W. to play the challenge matches that week because the other players had already played challenge matches to determine their seeds, and he needed T.W. to play and beat one of the top four players at that time or she would have to wait until later to play in competitive varsity matches. He stated that even if she lost in those matches, he "would have given her more chances if she showed some growth." (R. 41-2, PID 890.)

T.W. was supposed to play her first challenge match on Tuesday, March 31, but the other player cancelled, so T.W. joined the team at their match and played an exhibition game. On April 1, T.W. played matches against the two top-ranked players and lost.[6] After the second game, Clemons and T.W.'s stepfather—who were watching the practice—decided to stop T.W. from playing the third match because T.W. was having a difficult time and because Clemons believed that Ricke made T.W. play the top players first as a "set up." (R. 41, PID 709.) Specifically, she believed that "with knowing T.'s anxiety . . . and having school administration come witness the match, [Ricke] needed her to act out to prove his point and why he couldn't have her on the team." (*Id.* at 710.) She also testified that she believed it was unfair for Ricke to "force[]" T.W. to play

---

[6] Clemons testified that T.W. was the only player required to play four challenge matches in one day. The record does not support that assertion. Ricke stated that he did not require T.W. to play beyond the regular practice time and would have allowed her to spread out the matches over two days. The "T.W.'s Week of Tennis" sheet also stated that the matches could be spread out. (R. 35-19, PID 334.) Finally, observation notes made by T.W.'s counselor, Mrs. Graney, from practice on April 1 show that Ricke told T.W. she did not have to play all four matches that day.

the top two players in challenge matches at all because T.W. was not competitive with them. (*Id.* at 715.) Ricke explained that he had the top player play T.W. first because he wanted that player to be able to work on her forehand after the challenge match.

In any event, Clemons told T.W. to "tell [Ricke] that she did not have the physical stamina to continue with a third challenge match." (R. 41, PID 713.) Ricke told T.W. that she could finish the next day. T.W. began talking with Ricke and told him that she "won lots of games last year," and when Ricke told her she had won three games, she asked to see the records after practice. (R. 35-18, PID 331.) Observation notes from the practice state that after her last match, T.W. would not join team huddles, stating "I don't feel comfortable and they don't like me." (*Id.* at 331-32.) After practice, Ricke showed T.W. her record from the previous year. T.W. still insisted she had won more games and asked Ricke for an apology for keeping her from playing varsity. T.W. repeatedly asked Ricke about playing varsity and then left after having a conversation with Mrs. Graney and Clemons.

Clemons sent an email complaining to Principal Leeper that night and withdrew T.W. from MLCHS the next day.

## II.    Procedural History

Clemons brought this action alleging violations of Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Equal Protection Clause of the Fourteenth Amendment, and the Constitution of the Commonwealth of Kentucky.[7] Clemons alleged that Defendants violated Title IX by requiring girls—but not boys—to try out for the tennis teams. She alleged that Ricke discriminated against T.W. because of her disability by "[m]aking

---

[7] The Complaint did not specify which provisions of the Kentucky Constitution Defendants allegedly violated. The district court assumed that Clemons alleged a violation of Kentucky's Equal Protection Clause.

verbal statements regarding T.W. being different" from her team members, failing to invite her to the team banquet in 2014, requiring her to play challenge matches against the top four players in 2015, and cutting T.W. from the team in 2015. (R. 1, PID 4-6.) Defendants moved for summary judgment on all claims, and Clemons moved for summary judgment on her Title IX claim.

The district court granted summary judgment for Defendants on all claims. The court dismissed Clemons's Title IX claim against Defendants Ricke, Neihof, and Leeper in their individual capacities and granted summary judgment for SCBE on the merits of that claim. The district court found that Clemons's Section 504 claim was time-barred with respect to any alleged discrimination during the 2013-2014 academic year. With respect to the events of the 2014-2015 year, the court found that Clemons's Section 504 claim failed on the merits.

Clemons filed a motion to alter, amend, or vacate the judgment pursuant to Federal Rules of Civil Procedure 59(e) and 60(b), arguing that her Section 504 claim relating to the 2013-2014 tennis season was timely, and seeking reconsideration of the court's dismissal of her claims relating to the 2014-2015 season. The court granted that motion in part and considered the merits of Clemons's Section 504 allegations relating to the 2013-2014 school year. The court found that Clemons failed to establish a prima facie case of disability discrimination relating to the 2013-2014 season and maintained its previous grant of summary judgment for Defendants on all claims.

Clemons appeals the district court's grant of summary judgment to defendants.

## STANDARD OF REVIEW

We review grants of summary judgment de novo, drawing all reasonable factual inferences in favor of the nonmoving party. *Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir. 1999). "[S]ummary judgment is appropriate when there is no genuine issue of material fact in for

trial and the moving party is entitled to judgment as a matter of law." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## DISCUSSION

### I.     Title IX

Clemons argues that Defendants violated Title IX by holding tryouts for the girls' tennis team in 2015, but not the boys' team.  Defendants challenge Clemons's standing to bring this claim.

#### a.  Standing

To meet the requirements of Article III standing, Clemons must establish (1) injury in fact, (2) causation; and (3) redressability.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury in fact must be "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Id.* at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

Because T.W. was ultimately given a spot on the girls' tennis team despite being cut after tryouts, SCBE argues that Clemons cannot show injury in fact.  Clemons counters that despite being allowed back on the team, T.W. continues to suffer severe emotional distress and anxiety as a result her experiences with tennis, including tryouts and being cut from the team.

T.W. suffered a concrete and particularized injury when she was cut from the team following tryouts.  Although she was eventually placed back on the team, she missed several weeks of practice and playtime with her teammates.  Defendants' remedial action deprives Clemons of standing to pursue forward-looking relief, but does not deprive Clemons of standing to pursue damages for past injuries, including emotional injuries, suffered by T.W. as a result of her initial exclusion from the team.  *Hange v. City of Mansfield*, 257 F. App'x 887, 893-94 (6th Cir. 2007) (finding that plaintiff-employee who alleged due process violations after being subject to

12

"conditional termination" of employment lacked standing to pursue declaratory or injunctive relief because his conditional termination was rescinded; however, that plaintiff had standing to pursue monetary damages arising out of employer's past disciplinary actions); *City of Los Angeles v. Lyons*, 461 U.S 95, 107 n.8 (1983) (finding that plaintiff who had been put in a chokehold by police officers lacked standing to pursue injunctive relief but that he likely had standing to pursue an action for damages).

SCBE raises the issue of mootness for the first time in their brief on appeal, arguing that T.W.'s eventual placement on the tennis team rendered the dispute moot. This argument merely rephrases its standing argument in terms of mootness. As we have already noted, correcting an allegedly illegal action or policy does not prevent plaintiffs from seeking damages for past wrongs. *Miller v. City of Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010).

Accordingly, Clemons has standing to assert her Title IX claim against SCBE.

### b. Merits

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). With respect to athletic opportunities, Title IX requires that schools provide "gender-blind equality of athletic opportunity to . . . students." *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 273 (6th Cir. 1994) (citing 34 C.F.R. § 106.41(c)). However, it does not require "perfect parity" between sports programs. *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 697 (6th Cir. 2000). Instead, whether a school provides equal athletic opportunities to members of both sexes depends on a consideration of many factors, including:

> (1) [w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes; (2) [t]he

>  provision of equipment and supplies; (3) [s]cheduling of games and practice time; . . . (5) [o]pportunity to receive coaching and academic tutoring; . . . [and] (7) [p]rovision of locker rooms, practice and competitive facilities.

34 C.F.R § 106.41(c). The Department of Education's Office of Civil Rights issued a Policy Interpretation in 1979, 44 Fed. Reg. 71,413 (Dec. 11, 1979), which we have held is entitled to deference, *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002). "The policy interpretation is divided into three sections: (1) compliance in financial assistance (scholarships) based on athletic ability; (2) equivalence in other athletic benefits and opportunities (equal treatment claims); and (3) effective accommodation of student interest and abilities (accommodation claims)." *Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 918 (7th Cir. 2012) (citing 44 Fed. Reg. at 71,414). Because Clemons alleges disparate treatment of boys' and girls' tennis teams at MLCHS, her claim falls into the second category. The Policy Interpretation offers additional guidance on disparities in treatment, explaining that compliance may be determined by examining "[w]hether the policies of an institution are discriminatory in language or effect" and "[w]hether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity." 44 Fed. Reg. at 71,417.

Before turning to the merits of Clemons's disparate-treatment claim, we must determine the appropriate analytical approach.[8] To that end, we find our discussion in *Communities for*

---

[8] The district court analyzed Clemons's disparate-treatment claim under the burden-shifting framework established in *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff may establish a prima facie case of discrimination by showing "that he or she: (1) was a member of a protected class; (2) suffered an adverse [educational] action; (3) was qualified for the position; and (4) that a 'comparable non-protected person was treated better.'" *Arceneaux v. Vanderbilt Univ.*, 25 F. App'x 345, 347 (6th Cir. 2001) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). This court has previously applied the framework only to Title IX disparate-treatment claims brought by *employees* or students in clinical training programs who functioned as employees. *See Ivan v. Kent State Univ.*, No. 94-4090, 92 F.3d 1185 (Table), 1996 WL 422496, *2 (6th Cir. July 26, 1996) (per curiam). Because this approach fails to resolve the ultimate question whether female students are denied equal athletic opportunities, we decline to apply it in this case.

*Equity v. Michigan High School Athletic Ass'n*, 459 F.3d 676 (6th Cir. 2006), instructive. There, female athletes alleged that the state's athletic association violated Title IX by scheduling girls' sports during the off-season while scheduling boys' sports during the regular season. *Id.* at 679. We explained that the relevant question in evaluating disparate-treatment claims brought by student athletes is whether the disparate treatment resulted in unequal athletic opportunities for female athletes.[9] *Id.* at 696.

Similar cases from our sister circuits offer a more precise statement of that inquiry. In *Parker v. Franklin County Community School Corp.*, the Seventh Circuit described its analysis of the student athletes' disparate-treatment claim this way: "[w]e must first determine whether a difference in scheduling has a negative impact on one sex, and then determine whether that disparity is substantial enough to deny members equality of athletic opportunity." 667 F.3d 910, 922 (7th Cir. 2012) (citing *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 293 (2d Cir. 2004)). The court went on to explain that it would "look to the overall effect of any differences on a program-wide, not sport-specific basis," meaning that a disadvantage to girls in one sport might be made up for by a relative advantage in another. *Id.*; *see also McCormick*, 370 F.3d at 293 ("[C]ompliance should not be measured by a 'sport-specific comparison' but rather by examining 'program-wide benefits and opportunities.'" (quoting Policy Interpretation, 44 Fed. Reg. at 71,422)).

*Parker* and *McCormick* also provide useful examples of the types of disparities that Title IX prohibits. In *Parker*, the court reviewed a Title IX claim that arose out of disparate scheduling

---

[9] Notably, there are few cases from this court or elsewhere involving student athletes' disparate-treatment claims. As the Seventh Circuit explained in *Parker v. Franklin County Community School Corp.*, "a majority of litigation under Title IX has focused on 'accommodation' claims where plaintiffs assert that schools have failed to establish athletic programs to meet the interests and abilities of the underrepresented sex. Few cases have focused on 'equal treatment' claims seeking substantial equality in program components of athletics." 667 F.3d 910, 916 (7th Cir. 2012).

in basketball based on gender. 667 F.3d at 913. The scheduling disparity required the girls' team to play half of its games on school nights while allowing the boys' team to play its games on the weekends, thereby attracting a larger audience and ensuring that the boys could focus on their games rather than schoolwork. *Id.* at 923. The court found that the disparity was "systemic," having occurred over several years. *Id.* at 922. The court also found that the disparity resulted in a sense of inferiority, reduced school and community support, and disproportionate academic burdens for members of the girls' team. *Id.* at 923. Accordingly, the court concluded that there was an issue for trial regarding whether the disparity resulted in a denial of equal athletic opportunity for girls. *Id.* at 924. Similarly, in *McCormick*, the court determined that a scheduling disparity that denied the girls' soccer team the ability to play in state championships resulted in unequal athletic opportunities. 370 F.3d at 294-96.

Turning to Clemons's claim, we find that MLCHS's decision to hold tryouts for the girls' tennis team is plainly not the type of disparity for which Title IX provides a remedy. Although the tryouts had a negative effect on T.W. as an individual, there is no evidence that holding tryouts negatively impacted girls' athletic opportunities at MLCHS overall. The record shows that due to increased interest, girls at MLCHS had a more robust tennis program than boys. Ricke determined that the increased interest required him to be selective to assure that each female player received adequate court time. In all other respects, the programs were equal. The teams played on the same courts—also shared by the boys' and girls' teams of the other district high school—resulting in limited court time for all teams and the need to coordinate practices and matches. In sum, there is no indication that the tryouts had a negative impact on girls, much less that they created a "disparity substantial enough to deny members equality of athletic opportunity." 44 Fed. Reg. at 71,417.

Clemons argues that holding tryouts for girls alone "is significant enough in and of itself to deny equality of athletic opportunity," but only offers speculation in support of that assertion. (Appellant's Br. at 36.)  For example, she argues that holding tryouts could intimidate potential players, but does not offer evidence that the tryouts actually had that effect.  She also asserts that a girl who was "objectively superior to every player on the Boys' team in every way . . . would not get to play tennis for Collins High simply because she was a girl." (*Id.* at 39.)  But again, Clemons has not shown that objectively superior female athletes have been denied the opportunity to play tennis at MLCHS.

Accordingly, we affirm the district court's determination that SCBE is entitled to judgment as a matter of law on Clemons's Title IX claim.

## II.      Section 504 Claim

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  As an initial matter, we note that although Section 504 of the Rehabilitation Act confers a private cause of action, the Supreme Court has limited remedies available under Section 504 to equitable relief and compensatory damages.  *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).  Thus, to the extent Clemons seeks punitive damages, she is not entitled to relief.  *Id.*

A plaintiff bringing a claim under Section 504 must show, directly or indirectly, that (1) she is disabled under the statute; (2) she is "otherwise qualified" to participate in the program; and (3) she was excluded from participation in, denied the benefits of, or subjected to discrimination under the program solely by reason of her disability.  *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th

Cir. 2008). The parties do not dispute that T.W. has a disability under the statute or that MLCHS receives federal funding.[10]

Clemons concedes that there may be a lack of direct evidence that T.W. was discriminated against solely because of her disability. "Direct evidence . . . does not require the fact finder to draw any inferences to reach the conclusion that unlawful discrimination was at least a motivating factor." *Gohl v. Livonia Pub. Sch.*, 836 F.3d 672, 683 (6th Cir. 2016) (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013)). Clemons asserts that "Ricke's negative treatment of T.W. only deteriorated after Ricke was informed of T.W.'s Asperger's early in the spring of 2014," and suggests that this is direct evidence of discrimination. (Appellant's Br. at 45.) However, the record shows that T.W. complained of negative treatment from the first day of practice in 2014 and, in any event, this assertion requires an inference to reach the conclusion that Ricke discriminated against T.W. because of her disability. Clemons makes no other argument regarding direct evidence.

In the absence of direct evidence, we have applied the *McDonnell Douglas* framework to review students' Section 504 discrimination claims. *Gohl*, 836 F.3d at 682. The parties do not dispute that T.W. is disabled under the statute or that the MLCHS tennis program receives federal funding. Thus, to establish a prima facie case of discrimination, Clemons must show that T.W. was (1) "'otherwise qualified' for participation in the program" and (2) was "'excluded from participation in, denied the benefits of, or subjected to discrimination' because of [her] disability." *Id.* (quoting *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 635 (6th Cir. 2013)).

---

[10] We note that the Complaint does not specify whether the individual Defendants are sued in their individual or official capacities. To the extent they are sued in their official capacities, we "treat[] [the suit] as a suit against the entity," SCBE. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Because the parties and the district court discussed the Section 504 claim against Defendants generally, have made no reference to individual liability under Section 504, and have not raised the issue of qualified immunity, we presume that the action was brought against Defendants Leeper, Ricke, and Neihof in their official capacities. To the extent Clemons contends otherwise, we leave any resulting issues to the district court to resolve.

Clemons has established a genuine factual dispute as to whether T.W. was "otherwise qualified" for participation in the tennis program. A person with a disability "is 'otherwise qualified' to participate in a program if she can meet its necessary requirements with reasonable accommodation." *Mbawe v. Ferris State Univ.*, 751 F. App'x 832, 839 (6th Cir. 2018) (quoting *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998)). T.W. played tennis for three years before being cut from the team, and in 2014 won three games. The record does show that T.W. may not have been as skilled as other players and that she had a difficult time with accepting feedback and working on a team. However, a reasonable jury could conclude that with the benefit of reasonable accommodations, T.W. would have met the team's necessary requirements.

To establish the second element, Clemons must show that similarly situated, non-protected students were treated more favorably than T.W. *Gohl*, 836 F.3d at 683 (citing *Shah v. Gen. Elec. Co.*, 816 F.2d 264, 268 (6th Cir. 1987)). Clemons argues that T.W. was denied benefits, excluded from participation in tennis, or discriminated against when Ricke: (1) singled T.W. out for criticism in front of the team and ignored her; (2) failed to invite her to the end-of-year tennis banquet in 2014; (3) held tryouts and cut T.W. from the team in 2015; and (4) required T.W. to play in challenge matches in 2015.[11]

Regarding Ricke singling out or ignoring T.W., Clemons has failed to provide any evidence that Ricke in fact treated T.W. differently from other players. Although both Clemons and T.W. assert that Ricke criticized T.W. beginning in 2013-2014, Clemons admitted that Ricke "did this

---

[11] Clemons also argues that Ricke discriminated against T.W. when he required her to play in a challenge match to secure her place at the regional competition in the spring of 2014. Clemons failed to raise allegations related to those events in her complaint and did not present this argument until Defendants moved for summary judgment. Accordingly, the district court declined to analyze whether those matches were discriminatory. The district court did not abuse its discretion in declining to consider that claim because a party may not "expand its claims to assert new theories . . . in response to summary judgment." *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007).

with many of the other girls as well." (R. 35-9, PID 1062.) And although Clemons testified that Ricke ignored T.W. during matches, Clemons conceded that she did not know whether Ricke coached or actively corrected other players during matches. Indeed, she complained that Ricke became the coach "to socialize," not "to actually coach." (*Id.*) Thus, while Clemons has presented evidence that Ricke's coaching methods were, at least in her opinion, sub-par, she has not provided evidence sufficient to establish that Ricke discriminated against T.W. in these respects.

Nor has Clemons provided evidence sufficient to show that the challenge matches T.W. was required to play on April 1, 2015 were discriminatory. Although Clemons maintains that T.W. was the only player required to play four matches in one day, the evidence establishes that T.W. was *not* required to play four matches in one day. First, T.W.'s schedule for that week stated that she could spread out the matches over more than one day. And Mrs. Graney's observation notes from that practice show that when T.W. told Ricke she could not continue that day, Ricke told her that he understood and that she could finish the next day. Ricke testified that when T.W. played those matches, the other players had already established their seeds by playing in challenge matches during earlier practices. He asked T.W. to play that week because she had asked him whether she could play varsity, and he needed to determine her position. Clemons testified that she did not know if other girls also played challenge matches that season because she was not at practices.

With respect to Ricke's failure to invite T.W. to the end of year banquet in 2014, Clemons's argument fails because by the time the tennis banquet occurred, T.W. was no longer similarly situated to her teammates. Clemons withdrew T.W. from MLCHS and the tennis team on May 3; the tennis banquet took place on May 27, and in any event, T.W. was still allowed to attend.

However, Clemons has made out a prima facie case of discrimination with respect to T.W. not making the team following tryouts in 2015. Although Assistant Principal Deckard concluded that tryouts were equitable, Ricke testified that he decided T.W. would not make the team *before* tryouts even took place. Because T.W.'s peers—save for her sisters—were not excluded from or cut from the team, Clemons has shown that T.W. was treated differently from her non-disabled peers.

Because Clemons has established a prima facie case of discrimination regarding T.W. being excluded from the team, the burden shifts to Defendants to "offer a legitimate, nondiscriminatory reason" for that action. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (quoting *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014)). In doing so, "[Defendants'] burden is merely one of production, not persuasion." *Id.* (quoting *Sjostrand*, 750 F.3d at 599). The record reflects several reasons for Ricke's predetermination that T.W. would not be on the team. Ricke testified that, based on his interactions with T.W. in the time since the "meltdown[]" in 2014, he was very concerned that she would not be able to move past the events of the previous year. (R. 41-2, PID 881.) At tryouts, he observed that T.W. was "distraught around [him]" and that it affected her performance. (*Id.* at 880.) He explained that he "really felt it was in the best interest of TW to not be on that team because I was, to be honest, I was fearful that if she didn't make regions, which was a high probability, that she would threaten suicide again, or, in fact, actually do it." (*Id.* at 881.) He also testified that he was concerned about "disruptions," such as Clemons yelling at him in front of the team or T.W. throwing rackets, affecting the other players. (*Id.*)

Each of Ricke's reasons for deciding before tryouts that T.W. would not be on the team relate to behavior directly attributable to T.W.'s Asperger's Syndrome Disorder and anxiety. The

21

school's 504 meeting notes and testimony from both Ricke and Clemons make clear that T.W.'s disability caused her to respond poorly to feedback, have strong emotional responses, and fixate on certain people or events. Ricke may have had genuine concern for T.W., but the record supports the inference that he excluded her because of manifestations of her disability, and as noted above, a reasonable juror could find that even with this disability, T.W. was otherwise qualified to participate in the tennis program. That T.W. apparently performed poorly during tryouts is of no consequence: T.W. was treated differently from other players because Ricke determined *before tryouts began* that she would not make the team. Her performance during tryouts does not explain that determination.

Accordingly, we reverse the district court's grant of summary judgment to Defendants on Clemons's Section 504 claim.

## III.    Equal Protection Claim

Clemons alleges that the "girls-only tryout policy" and the alleged discrimination against T.W. based on her disability violate the Equal Protection Clause of the Fourteenth Amendment. (Appellant's Br. at 55.)

The Equal Protection Clause requires state actors to show that gender-based disparate treatment "'serves important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *United States v. Virginia*, 518 U.S. 515, 532-33 (1996) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). Assuming that holding tryouts for MLCHS girls and not boys constituted disparate treatment, that disparity survives heightened scrutiny. As discussed above, both teams shared limited court space with another high school. Ricke held tryouts because the limited space, coupled with the number of girls the previous year, limited the girls' play and practice time. In

contrast, the boys' coach had trouble finding at least seven players to field a team. The practice of holding tryouts was clearly related to resolving the problems caused by limited court space.

Clemons relies on *Communities for Equity* to support her argument that holding tryouts for the girls' team was unjustified. There, the state argued that the large number of female athletes in the state justified scheduling female teams to play in disadvantageous seasons because the schedule maximized participation. 459 F.3d at 693. We disagreed, finding that the state had not shown how "scheduling that results in girls bearing all of the burden of playing during disadvantageous seasons" achieved that objective. *Id.* at 694. *Communities for Equity* is inapposite. Here, Defendants have shown that holding tryouts for girls was related to the objective of resolving problems caused by limited court space.

Clemons also argues that Defendants' disparate treatment of T.W. because of her disability violated the Equal Protection Clause. "Disabled persons are not a suspect class for purposes of an equal protection challenge. A state may therefore treat disabled students differently, so long as its actions are rationally related to some legitimate governmental purpose." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 457 (6th Cir. 2008) (citation omitted) (citing *Tennessee v. Lane*, 541 U.S. 509, 522 (2004); *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366-68 (2001)). "[Clemons] therefore has the burden of showing that (1) [Defendants] treated [T.W.] differently—because [s]he is disabled—than similarly situated students who were like [her] in all relevant respects, and (2) the [D]efendants' actions bore no rational relationship to a legitimate governmental purpose." *Id.* at 458. In making the latter showing, Clemons's burden is substantial; she must "negative 'any reasonably conceivable state of facts that could provide a rational basis'" for the disparate treatment. *Garrett*, 531 U.S. at 367 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).

As discussed above, Clemons has shown that T.W. was treated differently from her peers when she was excluded from the tennis team before tryouts. But for equal protection purposes, that disparate treatment is acceptable if it was rationally related to some legitimate governmental purpose. Ricke asserted that he decided against having T.W. on the team because he was concerned about disruptions and worried that another year on the team would threaten her emotional and physical safety. Student safety and maintaining order are legitimate governmental purposes, 532 F.3d at 458 (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)), and Ricke's actions were rationally related to those purposes.[12] Thus, Clemons's claim fails.[13]

For the foregoing reasons, we affirm the grant of summary judgment to Defendants on Clemons's equal protection claim.

---

[12] Ricke did not assert a qualified immunity defense.

[13] Clemons presented no municipal liability argument against SCBE. It is well-established that municipalities are liable for constitutional violations under 42 U.S.C. § 1983 only "where a custom, policy, or practice attributable to the municipality was the 'moving force' behind the violation of the plaintiff's constitutional rights." *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012) (quoting *Miller v. Sanilac Cty.*, 606 F.3d 240, 255 (6th Cir. 2010)). Had we found that SCBE committed a constitutional violation, Clemons's failure to argue that SCBE was the "moving force" behind the violation would have doomed her claim against it. Because we find no constitutional violation, however, we need not discuss SCBE's liability. *Gohl*, 836 F.3d at 685.